USA v. Parse

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2014

(Argued:  October 16, 2014        Decided:  June 8, 2015)

Docket No. 13-1388

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

DAVID PARSE,

Defendant-Appellant.

_____

Before:  KEARSE, STRAUB, and WESLEY, Circuit Judges.

Appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York, William H. Pauley III, Judge, following a trial at which the jury found defendant guilty of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and attempting to interfere with the administration of the federal tax laws, in violation of 26 U.S.C. § 7212(a), and found some of his codefendants guilty of those and other tax-related offenses.  Defendant contends principally that the district court--which, pursuant to Fed. R. Crim. P. 33 granted a new trial to his codefendants on the ground of juror misconduct where one of the jurors had lied on voir dire, had

deliberately concealed relevant information about herself, her family, and her past, and was found to have been actually biased against the defendants--erred in denying defendant's Rule 33 motion on the basis that defendant had waived his right to an unbiased jury. See United States v. Daugerdas, 867 F.Supp.2d 445 (S.D.N.Y. 2012).

Vacated and remanded.

Judge Straub, in a separate opinion, concurs in the judgment and in the majority opinion in part.

> STANLEY J. OKULA, JR., Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Brian A. Jacobs, Assistant United States Attorney, Nanette L. Davis, Special Assistant United States Attorney, New York, New York, on the brief), for Appellee.

> ALEXANDRA A.E. SHAPIRO, New York, New York (Marc E. Isserles, James Darrow, Chetan A. Patil, Shapiro, Arato & Isserles, New York, New York, on the brief), for Defendant-Appellant.

> Gibson, Dunn & Crutcher, New York, New York (Lawrence J. Zweifach, Jane Kim, of counsel), and Arnold & Porter, New York, New York (Craig A. Stewart, Alexandra L. Mitter, of counsel), filed a brief for Amicus Curiae New York Council of Defense Lawyers, in support of Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant David Parse appeals from a judgment entered in the United States District Court for the Southern District of New York following a jury trial before William H. Pauley III, Judge, convicting him on one count of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and on one count of corruptly endeavoring to obstruct and impede the administration of the internal revenue laws, in

2

violation of 26 U.S.C. § 7212(a). Parse was sentenced principally to 42 months' imprisonment, to be followed by three years of supervised release, and was ordered to forfeit $1,000,000 and to pay $115,830,267 in restitution. On appeal, he contends principally that he should have been granted a new trial on the ground of newly discovered evidence of juror bias; he challenges the district court's denial of his posttrial motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure for that relief, made jointly with his codefendants against whom the jury had returned verdicts of guilty, in light of postverdict evidence establishing that one of the jurors had lied on voir dire, concealed relevant information, and was actually biased against the defendants. The district court granted the new-trial motion of Parse's codefendants; but it denied the motion of Parse, finding that his attorneys either knew of the juror's misconduct prior to the verdict or failed to act with reasonable diligence based on the information they had, and that Parse had thus waived his right to an impartial jury. Parse also contends that the evidence was insufficient to support the jury's verdicts against him, and he challenges certain of the instructions given to the jury. Finding merit in Parse's challenge to the denial of his Rule 33 motion, but not in his sufficiency challenges, we vacate the judgment and remand for a new trial of the counts on which Parse was convicted.

## I. BACKGROUND

Parse and several others were indicted in 2009 and were ultimately charged with one count of conspiracy to defraud the United States and to commit mail fraud, wire fraud, and tax evasion, in violation of 18 U.S.C. § 371, and with multiple substantive counts of tax evasion and other tax-related offenses in connection with the creation of a series of tax shelters "designed and marketed

by [a law firm and an accounting firm] to take advantage of Internal Revenue Code . . . loopholes so taxpayers could claim non-economic tax losses to avoid taxes they otherwise would have owed" (Parse brief on appeal at 7). Parse was a broker employed by an investment banking firm that executed transactions for implementation of the shelters.

In the spring of 2011, Parse was tried along with four of his codefendants: Paul Daugerdas and Donna Guerin, who were attorneys at the law firm; Denis Field, a member of the accounting firm; and Craig Brubaker, a broker at the investment bank that employed Parse. Following a three-month trial at which 41 witnesses testified and some 1,300 exhibits were admitted, the jury on May 24 returned a split verdict. It found Parse guilty on two counts--the substantive mail fraud and obstruction charges described above--and found him not guilty on the other four counts against him. (See Trial Transcript ("Tr.") 9153-54, 9159-63.) It found Daugerdas guilty on all 24 counts against him; found Guerin guilty on all 12 counts against her; found Field guilty on all 7 counts against him; and found Brubaker not guilty on any of the counts against him. (See id. at 9153-63.)

A. The District Court's Findings of Juror Misconduct

In July 2011, Parse, Daugerdas, Guerin, and Field moved pursuant to Fed. R. Crim. P. 33(a) for a new trial on the ground that one of the jurors, Catherine M. Conrad--"Juror No. 1" (or "Conrad")--had lied and withheld material information during voir dire and was biased against defendants. The motion was made some two weeks after the government disclosed to defendants and the district judge a letter it had received from Conrad shortly after the return of the verdict. (See Part I.A.2. below.) Following completion of the parties' submissions on the motion, including information from Parse's attorneys as to their earlier suspicions about Conrad (see Part I.B. below) and an

4

evidentiary hearing, the district court, in a thorough opinion, see United States v. Daugerdas, 867 F.Supp.2d 445 (S.D.N.Y. 2012) ("Daugerdas"), found it "undisputed that Conrad lied extensively during voir dire and concealed important information about her background," id. at 451. The district court's description of the voir dire proceedings concerning Conrad and the information about her that was unearthed in Parse's attorneys' investigations, as to which there is no material dispute, included the following.

1. Conrad's Voir Dire

For jury selection, an initial venire of 450 prospective jurors had been assembled; "the Jury Department provided counsel with a jury roll identifying the prospective jurors in the venire, and listing a 'Catherine M. Conrad' with a Bronxville residence." Daugerdas, 867 F.Supp.2d at 449. Preliminary procedures winnowed the number of prospective jurors from 450 to approximately 175; the panel of 175 was sworn in for voir dire. In discussing defendants' new-trial motion, the district court stated, quoting the transcript of the voir dire proceedings, that the court had

> posed a number of questions to the panel as a whole, including five that are relevant to this motion:
>
> 1. "Do any of you know or have you had any association, professional, business, social, direct or indirect, with any member of the staff of the United States Attorney's Office for the Southern District of New York, the United States Department of Justice, or the Internal Revenue Service? Has anybody had any dealings with the U.S. Attorney's Office, the Department of Justice, or the IRS?" (Trial Tr. 84-85.)
>
> 2. "Are you or [has] any member of your family ever been a party to [a] lawsuit, that is, a plaintiff or a defendant in a civil case or a criminal case?" (Trial Tr. 105.)

5

3. "<u>Have</u> any of <u>you</u> or a close relative <u>ever been involved</u> or appeared as a witness <u>in any investigation by</u> a federal or state grand jury or any congressional committees or <u>state</u> legislative bodies or <u>licensing authorities</u> or planning boards?" (Trial Tr. 107.)

4. "Have any of you ever been a witness or a complainant in any hearing or trial, whether it be in the state or federal courts?" (Trial Tr. 108.)

5. "[H]ave you or any member of your family or any very close personal friend <u>ever been arrested or charged with a crime</u>?" (Trial Tr. 118.)

<u>Conrad responded affirmatively to only two of these questions</u>. In response to the <u>first question</u>, Conrad offered that her father "works for DOJ across the street" as "an immigration officer." (Trial Tr. 85.) She then assured this Court that his position would not affect her ability to be fair and impartial. (Trial Tr. 85.) In response to the <u>second question</u>, Conrad stated that she "was a plaintiff in a personal injury negligence case . . . pending" in Bronx Supreme Court. (Trial Tr. 105.) Again, she represented that her personal injury action would not interfere with her ability to serve as a juror. (Trial Tr. 106.) <u>Conrad did not provide any additional information or any other affirmative answers to questions posed to the group.</u>

<u>Daugerdas</u>, 867 F.Supp.2d at 449-50 (emphases ours).

The district court had proceeded to ask further, more detailed, questions of the prospective jurors individually.

THE COURT: . . . . Ms. Conrad . . . . would you tell us what neighborhood you reside in?

CONRAD: Bronx Village [sic] [Bronxville] in Westchester.

THE COURT: <u>How long have you lived at your current address</u>?

CONRAD: <u>My whole life</u>.

. . . .

THE COURT: Do you work outside the home?

CONRAD: No. I'm a stay-at-home wife.

. . . .

THE COURT: . . . . What is the highest level of education you've attained?

CONRAD: I have a BA in English literature [and] classics, and I studied archeology abroad.

Id. at 450-51 (quoting voir dire transcript at 203-04 (emphases ours)). The court noted that it had offered prospective jurors the opportunity to come to the bench for a sidebar with respect to any information that they preferred not to give publicly. Several prospective jurors took advantage of that offer, but Conrad sought no such sidebar and provided no other information in response to these questions. See id. at 450.

The court found that Conrad in voir dire had lied about, among other matters, her own background and that of her husband.

Conrad lied about her educational, professional, and personal background. While she informed the Court that her highest level of education was a bachelor's degree, she in fact obtained her juris doctorate from Brooklyn Law School in 1997 and was admitted to practice law in New York in January 2000. . . . Further, although she informed the Court that she was a "stay-at-home wife," she had practiced law for some time until the New York Supreme Court Appellate Division, First Department (the "Appellate Division") suspended her law license. . . . And the day before she was sworn as a prospective juror, she sought to have her law license reinstated. Conrad answered under oath that she owned a home and lived in Bronxville in Westchester County "all my life." (Trial Tr. at 203.) That, too, was a lie. In fact, Conrad rented an apartment and lived on Barker Avenue in the Bronx for years.

Daugerdas, 867 F.Supp.2d at 452 (emphases ours); see also id. at 458 (finding that on the juror qualification questionnaire completed under oath prior to voir dire, Conrad "lied" in stating that "her permanent address was in Bronxville, New York," thereby enabling her to collect "collect[] an

7

additional $765 in travel expenses based on her use of a Westchester zip code").

As to the concealment by Conrad of the fact that she had been educated as and practiced as an attorney, the court noted that

> Conrad also hid the fact that she was the subject of an investigation and disciplinary proceedings conducted by the Departmental Disciplinary Committee (the "Disciplinary Committee") of the Appellate Division. In December 2007, the Appellate Division suspended Conrad from the practice of law for failing "to cooperate with the [Disciplinary] Committee's investigation into two complaints alleging professional misconduct which threatens the public interest." In the Matter of Catherine M. Conrad ("2007 Suspension Order"), 48 A.D.3d 187, 188, 846 N.Y.S.2d 912 (1st Dep't 2007). According to one complaint, Conrad "violated court orders and failed to appear as directed, ultimately resulting in the dismissal of the action." 2007 Suspension Order, 48 A.D.3d at 188, 846 N.Y.S.2d 912. According to the second complaint, she failed to oppose an order to show cause, resulting in an adverse ruling against her client. 2007 Suspension Order, 48 A.D.3d at 188, 846 N.Y.S.2d 912. In response to her state bar suspension, on January 4, 2008, Conrad was suspended from the bar of the United States District Court for the Southern District of New York. See In re Catherine M. Conrad, No. M-2-238 (JSR) (S.D.N.Y. Jan. 4, 2008); see also Local Civ. Rule 1.5(b)(5) (violations of the New York State Rules of Professional Conduct are grounds for discipline, including suspension). On January 29, 2008, Conrad was suspended from the bar of the United States District Court for the Eastern District of New York. See In re Catherine M. Conrad, No. MC-08-010 (BMC) (E.D.N.Y. Jan. 29, 2008).

Daugerdas, 867 F.Supp.2d at 453. With respect to the fact that Conrad was seeking to practice law again, the court found that her "application for reinstatement," filed on the day before voir dire began,

> was riddled with falsehoods. She failed to report that she had not paid a fine imposed on her by the Eastern District of New York, even though the application required that disclosure. (See . . . Letter from Chief Counsel Jorge Dopico of the Disciplinary Committee, dated Aug. 9, 2011 ("Dopico Letter"), at 3.) She also stated, in response to a direct question on the application, that she had not used any other names, even though she had used the name "Catherine Rosa" when arrested in May 2009. (Dopico Letter, at 5). Finally, she stated that she had no arrests or convictions since her suspension in 2007, when in fact she had pleaded guilty to shoplifting charges in October 2009. (Dopico Letter, at 5.)

8

Daugerdas, 867 F.Supp.2d at 454.

The court went on to recount other instances of Conrad's misrepresentations as to her criminal history:

> According to New York and Arizona criminal records, <u>Conrad was arrested and charged with crimes on at least five occasions</u>. . . .
>
> On April 17, 1998, Conrad was arrested in New York and charged with driving while intoxicated, reckless endangerment, leaving the scene of an accident, assault, resisting arrest, and harassment. . . . On October 21, 1998, <u>she pleaded guilty</u> to the misdemeanor driving while intoxicated charge. . . . Shortly before that plea, on September 23, 1998, she was arrested again and charged with criminal contempt and aggravated harassment. <u>She pleaded guilty</u> to these misdemeanors on May 17, 1999, and was sentenced to three years probation. . . .
>
> On August 4, 2007, Conrad was arrested in Arizona for disorderly conduct. . . . At approximately 5:00 a.m., local police responded to a call from Conrad, complaining of a domestic dispute at a motel with Rosa, who she had married six weeks earlier. . . . As the police investigated, she was highly disruptive, disturbed other hotel guests, and ignored the responding officers' requests to quiet down. Ultimately, the officers placed Conrad under arrest and booked her at the Navajo County Jail on charges of disorderly conduct. On August 7, 2007, Conrad was released on her own recognizance and <u>ordered to appear for arraignment on August 14</u>. . . . <u>She failed to appear and an arrest warrant was issued</u>. . . . <u>It appears that warrant remains outstanding</u>.
>
> In May 2009, Conrad was arrested in New York on two separate occasions for shoplifting. . . . <u>On May 6, she was arrested</u> for shoplifting $47 worth of groceries from a Yonkers supermarket. . . . Days later, <u>on May 14, she was arrested again</u> for shoplifting approximately $27 worth of goods from a New Rochelle supermarket. . . . <u>Both charges were resolved by a plea</u> to a single count of petit larceny. . . . Under her plea agreement, Conrad was placed on probation for three years. . . . A July 14 probation report noted that Conrad was in an outpatient treatment program for alcoholism. . . . An October probation report indicated that the outpatient program expelled her because of her continued use of alcohol and recommended a four-week inpatient program. . . . While it is unclear whether she participated in that program, <u>Conrad was on probation during voir dire and throughout the entire trial of this case</u>.

Daugerdas, 867 F.Supp.2d at 454-55 (emphases added).

In Conrad's voir dire, she had been asked whether there were other members of her household and had responded that she lived with her husband, whom she described as being retired. When the court asked "What is he retired from?" Conrad responded, "He owns some bus companies." Id. at 450 (internal quotation marks omitted). The district court found that in fact "Conrad's husband, Frank J. Rosa ('Rosa'), is a career criminal," id. at 454, and that her response was a "fabrication . . . designed to conceal his criminal past," id. at 455:

> According to public records, from 1980 through the late 1990s, Rosa was convicted of at least nine criminal offenses. . . . Among other crimes, he was convicted of receiving stolen property, criminal contempt, possession of a controlled substance, forgery, and illegal possession of a firearm. . . . He has been incarcerated on numerous occasions and served a seven year sentence in Northern State Prison in New Jersey.

Id.

2. Conrad's Posttrial Letter to the Government

The jury's verdict in the present case was returned on May 24, 2011. On May 25, 2011, Conrad wrote a letter to the Assistant United States Attorney who led the government's trial team (the "May Letter"), praising its performance at trial but lamenting the acquittals of Parse. The district court described the letter as follows:

> Conrad authored a two-page type-written letter dated May 25, 2011 to Assistant United States Attorney Stanley J. Okula, Jr. ("Okula") praising the Government's prosecution of the case (the "May Letter"). The May Letter was postmarked May 28. On June 22, the Government forwarded the May Letter to the Court and defense counsel. . . . In her letter, Conrad wrote, "I thought that you [i.e., Okula], Ms. Davis and Mr. Hernandez [other members of the Government's trial team] did an outstanding job on behalf of Our Government." In describing the jury's role, she stated that "I did feel that we

10

reached a fair and just verdict based on the case, facts and evidence presented to us." She further explained that "we did have qualms with Mr. David Parse. I solely held out for two days on the conspiracy charge for him I wanted to convict 100%, (not only on that charge)--but on Tuesday, May 24, 2011, we had asked for the Judge's clarification of 'willfully' and 'knowingly', I believe, and I had to throw in the towel." Conrad went on for an additional two paragraphs discussing the strengths and weaknesses of the Government's case against Parse, the effectiveness of expert witness testimony, the persuasiveness of certain evidence, and the credibility of fact witnesses. She concluded her letter by writing, "I have learned, the saying a 'federal case' is REALLY a 'federal case', and I feel privileged to have had the opportunity to observe la creme de la creme--KUDOS to you and your team!!!"

Daugerdas, 867 F.Supp.2d at 452 (capitalization in May Letter) (italics ours). (See also May Letter at 2 ("Mr. Parse presented a conundrum--not for me, but for the other eleven.").)

Defendants' motion for a new trial stated that Conrad's May Letter had prompted them to investigate Conrad and that they thereby learned of her disciplinary proceedings and her status as a suspended lawyer by searching public records. The court eventually scheduled an evidentiary hearing with respect to Conrad's conduct (see Part I.A.3. below) and with respect to the timing of the parties' knowledge of her misconduct (see Part I.B. below).

### 3. The Evidentiary Hearings on Conrad's Conduct

The evidentiary hearing was scheduled for February 15-16, 2012. In the meantime, the court ordered Conrad to appear in person on December 20, 2011--with the parties agreeing to participate by telephone--in order for the court to instruct Conrad as to her constitutional rights and to appoint an attorney for her if she could not afford one:

The Court directed the U.S. Marshals to serve Conrad with a copy of the order to appear. The marshals served Conrad at her apartment in the Bronx, and on receiving the order, she stated, "I think I know what this is about, I failed to disclose that I'm a lawyer, but they never asked, so I didn't lie." Conrad

11

recognized a photograph of herself that the marshals carried and said, "that picture must be from my rap sheet." (GX 3500-2, U.S. Marshals Report dated Dec. 16, 2011.)

Daugerdas, 867 F.Supp.2d at 455. At the December hearing,

Conrad advised the Court that there was no reason for an evidentiary hearing because, in her view "[Defendants are] fricken crooks and they should be in jail and you know that." (12/20 Tr. 17.) She went on to opine: "come on, this is anything in favor of the defendants. . . . And they brought the motion against the prosecution . . . . It's ridiculous." (12/20 Tr. 17.)

Daugerdas, 867 F.Supp.2d at 455-56.

On February 15, 2012, Conrad refused to present herself at the evidentiary hearing. She attended only after the court issued a warrant for her immediate arrest, and the U.S. Marshals took her into custody and brought her to court. See id. at 475. At the February hearing ("Hearing" or "Hr'g"), Conrad invoked her Fifth Amendment privilege against self-incrimination but, on motion of the government, was granted use immunity. See id. at 456 n.2 (immunity from use of her "testimony or other information compelled under this Order, or any information directly or indirectly derived from such testimony or other information, . . . except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order." (internal quotation marks omitted)).

At the Hearing, Conrad admitted that she lied to the Court to make herself more "marketable" as a juror. . . . She also testified that she believed that if the truth were known, "the defense counsel would be wild to have me" on the jury. . . . Conrad reasoned that Defendants would want "crooks" on the jury because they themselves were "crooks." . . . . Indeed, Conrad admitted that she had used this to rationalize her conduct to herself at the time of voir dire. (Hr'g Tr. 229 ("Q. You told yourself at the time that it was OK from the defendants' perspective because, if anything, somebody who was married to a criminal would tend to favor other criminals, right? A. I guess it can be characterized as that.").) Conrad acknowledged that she made the conscious decision to perjure herself between the first and second day of voir dire. After hearing the questions posed to the first two prospective jurors, she conjured up a personal profile that she thought would be attractive. . . .

12

At the Hearing, Conrad opined that "most attorneys" are "career criminals." . . . . Daugerdas and Guerin are attorneys, and while Parse is [sic] licensed to practice law, he is an investment banker. She twice underlined the difference in financial success between herself and Daugerdas. When asked if she had about $14,000 in assets, Conrad retorted: "Correct. Much less than your client." . . . . When asked whether she was financially successful as a lawyer, Conrad testified: "I don't live an extravagant lifestyle like Mr. Daugerdas."

Daugerdas, 867 F.Supp.2d at 456 (footnote omitted) (emphases and brackets ours).

When given a chance to explain her declaration that all the Defendants were "crooks" and that their motion for a new trial was "ridiculous," she claimed repeatedly that she did not recall what she meant to convey. She also claimed she did not know why she made those statements because "I'm not a psychologist."

Id. Her responses to other inquiries into her past statements were similarly evasive. See id. at 456-57; id. at 457 ("She claimed repeatedly that she could neither understand the questions nor remember the facts.")

The court concluded that Conrad was "a pathological liar and utterly untrustworthy."

Id. at 470.

Conrad's lies are breathtaking. In response to direct and unambiguous questions, she intentionally provided numerous false and misleading answers and omitted material information. Conrad's lies were calculated to prevent the Court and the parties from learning her true identity, which would have prevented her from serving on the jury. This is not a case where the relevant voir dire questions were somehow vague or ambiguous, particularly given Conrad's status as an attorney. . . . The Court's questions to Conrad were clear, simple, and direct.

The events she lied about were recent, personally significant, and directly affected her qualifications to serve as a juror. Her arrests and suspensions from the practice of law were not the result of youthful indiscretions or errors on the part of police or courts. . . . There is no dispute that Conrad was aware of her prior convictions, her attorney disciplinary problems, and her personal injury suit at the time she answered the Court's questions under oath. There is also no question that she made a conscious

13

decision to hide them from the Court.

Id. at 468-69 (emphases added). Conrad testified that she knew she could have made nonpublic disclosures to the court and the attorneys at a sidebar; but she said "'I know my disclosures definitely would not have allowed me to sit as a juror.'" Id. at 469 (quoting Hr'g Tr. 237). The court concluded that Conrad's answers concealing material facts were attributable neither to a desire to avoid embarrassment nor to honest mistakes:

> They were deliberate and intentional lies. Conrad confessed that she purposefully lied and omitted material information in her voir dire testimony to make herself more "marketable" as a juror. She yearned for professional redemption or some psychic satisfaction: "And having been suspended for so long, I guess mentally I would think maybe I'm back in the swing of things now." (Hr'g Tr. 236.) It is evident that Conrad's untruthful responses to the Court's voir dire questions were premeditated and deliberate. There is no innocent explanation.

Daugerdas, 867 F.Supp.2d at 469.

The court found "that Conrad was actually biased against Defendants." Id. at 471. It also observed that

> Conrad's May Letter to Okula buttresses the conclusion that she was actually biased. Written the day after the trial concluded, the May Letter indicates that Conrad identified with the Government. She expressed that bias in her emphasis on "Our Government"--a phrase she could not explain. (Hr'g Tr. at 202.) Her bias also bled through when she wrote that she "did fight the good fight" against acquitting Parse on any counts but eventually had to "throw in the towel." Her choice of words shows that Conrad saw herself not as a fact-finder, but as a partisan for "Our Government." In addition, Conrad included her cell phone number in the return address of the May Letter, and she testified that she was "very anxious" to talk to the prosecutors after the verdict. (Hr'g Tr. at 194.) By contrast, she testified that there was "no reason" for her to talk to the defense lawyers. (Hr'g Tr. at 195.)

Daugerdas, 867 F.Supp.2d at 471 (emphases ours).

The court discredited Conrad's self-serving claims that she was unbiased, crediting

14

instead her overtly biased statements:

> Conrad's own statements and demeanor belie her claim of impartiality. Her animus toward lawyers--like Defendants here--was evident not only in her comment that most attorneys are criminals but also in her attitude at the evidentiary hearing. Her comment that all attorneys are "crooks" was a direct statement of bias against the Defendants. Conrad's statement can only be understood as reflecting a pre-existing bias against lawyers.

Id. (emphases ours).

B. Defendants' Knowledge or Suspicions as to Conrad's Misconduct

The memorandum of law in support of defendants' new-trial motion, which had been drafted largely by Parse's attorneys, see Daugerdas, 867 F.Supp.2d at 458 n.3, suggested that defendants had had no inkling of any misconduct by Conrad prior to her posttrial letter to the government. The district court noted that the memorandum stated that

> "[t]he tone and content of [Conrad's May Letter], which were in sharp contrast to the image Conrad had projected through the trial ('always head down, taking notes!'), caused defendants concern and prompted them to investigate." (Memorandum of Law in Support of Defendants' Motion for a New Trial, dated July 8, 2011 ("Def. Br.") at 9 (emphasis added) (quoting the May Letter).) Defendants also stated they learned of, inter alia, Conrad's status as a suspended lawyer and the pending disciplinary proceedings against her by "conducting public records searches in the wake of Conrad's May 25, 2011 post-verdict letter to the government[.]" (Def. Br. at 3 (emphasis added).) They further stated that "Conrad's voir dire responses did not provide even a hint of bias and she exhibited no outward signs of any mental or emotional instability[.]" (Def. Br. at 8.) And they represented that they "had no basis to inquire whether Conrad was lying in response to each of the Court's questions [during voir dire]." (Def. Br. at 32 n. 13.)

Daugerdas, 867 F.Supp.2d at 458. The court found that, absent any other information, "the clear implication of these statements was that they had no idea of Conrad's true identity and background until their post-verdict investigation following the receipt of Conrad's May Letter." Id.

The court sought additional information in a July 15, 2011 conference call with the parties. In that call, the government said it had been unaware of any of the facts set out in defendants' motion, and it questioned whether defendants' rights to challenge Conrad had been waived. The court asked whether any of the defendants had previously been aware of the facts set out in the new-trial motion. The attorneys for Daugerdas, Guerin, and Field promptly responded that they had had no prior knowledge of any of the facts that had come to light about Conrad's nondisclosures and misrepresentations. See id. at 459.

The responses of Parse's counsel were far less unequivocal and prompted the court to request further information from that firm:

> Parse's counsel, Theresa Trzaskoma ("Trzaskoma"), responded, "Your Honor, we were not aware of the facts that have come to light and I think that if your Honor deems it appropriate, we can submit a letter." . . . . This Court invited a submission from Parse's counsel to make certain that no jury consultant had any information about Conrad before the verdict. . . . The colloquy concluded with a seemingly innocuous feint by Parse's counsel: "The only thing additional that I would offer, your Honor, is--well, we can address this in the letter. I think it's more appropriate."

Id.

Thereafter, Theresa Trzaskoma, Susan Brune, and Laurie Edelstein, partners in Brune & Richard LLP (or "B&R"), Parse's trial attorneys, "began to disclose in stages the full extent of their investigation into Conrad's background." Id.

> On July 21, Brune submitted a letter revealing for the first time that prior to voir dire, Brune & Richard had conducted a Google search of the terms "Catherine Conrad" and "New York" and discovered the 2010 Suspension Order, suspending a Catherine M. Conrad from the practice of law. (Brune & Richard Letter dated July 21, 2011 ("July 21 Letter") . . . .) But because Conrad stated during voir dire that her highest level of education was a B.A. in English Literature, the Brune & Richard trial team concluded that Conrad could not be the suspended lawyer. (July 21 Letter, at 2.) Despite the exact

16

match of Conrad's name with the middle initial "M." on both the jury roll and the 2010 Suspension Order, Brune & Richard ruled out the possibility that Conrad lied during voir dire, and they did not raise their discovery of the 2010 Suspension Order with the Court. (July 21 Letter, at 2.)

Daugerdas, 867 F.Supp.2d at 460 (emphases ours).

In the July 21 Letter, Brune & Richard also disclosed for the first time that they had conducted additional research about Conrad following her submission of a note to the Court on May 11, 2011 (the "Juror Note"), in the midst of closing arguments. (July 21 Letter, at 2.) The Court shared the contents of the Juror Note with counsel at the end of the day after closing arguments concluded. (Trial Tr. 8832.) In the Juror Note, Conrad asked whether the Court would instruct the jury on the legal doctrine of respondeat superior and posed a question about vicarious liability. (Trial Tr. 8832.) No party had raised either term during trial, and neither term was germane to the questions at issue.

The Juror Note prompted Trzaskoma to direct a paralegal to conduct further research on Conrad early the next morning. The paralegal conducted a Google search and located the 2007 and 2010 Suspension Orders, which suspended "Catherine M. Conrad" from the practice of law in New York. (July 21 Letter, at 2.) The paralegal also searched Westlaw for information on "Catherine M. Conrad," generated a report (the "Westlaw Report"), and provided it to Trzaskoma. (July 21 Letter, at 2; Ex. 1.) The Westlaw Report-- in Brune & Richard's hands just after the start of jury deliberations--was freighted with information revealing Juror No. 1's hidden identity. The Westlaw Report lists a previous address for Catherine M. Conrad in Bronxville--the same exact name and town listed for Conrad on the jury roll-- and also shows that Conrad was a suspended attorney with a Bronx address. It lists Robert J. Conrad as a member of Conrad's household and indicates that Conrad was involved in a civil lawsuit in Bronx Supreme Court. The Westlaw Report links the Bronx civil suit to Conrad--the suspended attorney--with a "Confidence Level" of 99%.

Daugerdas, 867 F.Supp.2d at 460-61 (footnote omitted) (emphases ours).

According to the July 21 Letter, after receiving the Westlaw Report, "Trzaskoma had the initial thought that the lawyer and the juror were potentially one and the same, but she reviewed the report and found it confusing, internally inconsistent and not reliable." (July 21 Letter, at 2.) Trzaskoma then conferred with Brune and Edelstein. They believed Conrad's use of legal terms in the Juror Note was consistent with her involvement in a

personal injury action and thought that it was "inconceivable" that Conrad lied during voir dire. Thus, they concluded collectively that she could not be the suspended attorney. (July 21 Letter, at 2-3.) After reaching that conclusion, they did not bring any of the underlying information to the attention of the Court or the Government. Nor did they revisit the question between May 12 and May 24, when the jury returned its verdict.

After receiving Conrad's post-verdict May Letter, Parse's attorneys conducted another Google search of Conrad and once again located the 2010 Suspension Order. (July 21 Letter, at 3.) This time, they matched a telephone number Conrad provided in the May Letter with a telephone number associated with Conrad on the New York State Unified Court System's attorney registration website. (July 21 Letter, at 3.) At this point, Parse's trial team purportedly realized, for the first time, that it was no longer "inconceivable" that Conrad was not who she claimed to be during voir dire. (July 21 Letter, at 3.) Brune & Richard then conducted a two-week investigation, which unearthed Conrad's personal injury lawsuit filings, her property records, her criminal records, her husband's criminal records, and their marriage records. (July 21 Letter, at 3-4.) Only then did they apparently conclude that they had the metaphysical certainty necessary to alert this Court to Conrad's juror misconduct and to seek a new trial for Parse. (July 21 Letter, at 3-4.)

Daugerdas, 867 F.Supp.2d at 461 (emphases ours).

Upon receiving the July 21 Letter, this Court scheduled another conference call with the parties and counsel. During that call, this Court questioned Brune about the discrepancies between the version of events provided in the motion papers and the July 21 Letter. (See July 22, 2011 Transcript ("7/22 Tr.") 5.) Brune endeavored to explain:

Your Honor, when we submitted the brief that we did we were submitting with the other three lawyers and as demonstrated by the statements that three of the firms made on the phone on the Friday [July 15th] conference, their level of knowledge is apparently non-existent and our situation is different and it is for that reason that Ms. Trzaskoma proposed to file the letter which we did as opposed to just responding on the call. We did not know that this juror was essentially posing as a different person at no point during the trial.

We certainly anticipated that the government was going to raise the issue of waiver, it features prominently in the Supreme Court case that controls here, and we anticipated that when he inquired, which he inevitably was going to do, we were going to lay out the facts

18

accurately as we have. And my sense of what we are trying to accomplish--but of course your Honor will guide me on this--is that Mr. Okula needed the facts so that he can make whatever waiver argument he proposes to make in his brief. And it is with that in mind, and I of course also responded to the Court, that I laid this out.

But, I certainly didn't mean to suggest by our opening brief that we had no information about Ms. Conrad. We had the information that I've laid out but at no point did we know that she was perpetrating a fraud on this Court and unfortunately harming Mr. Parse in the way that she did.

(7/22 Tr. 5-6.)

Daugerdas, 867 F.Supp.2d at 461-62. The district court stated that at the February 2012 Hearing, Parse's attorneys

acknowledged candidly that had the Court or the Government not inquired, Brune & Richard would never have disclosed any of their investigation into Conrad. (Hr'g Tr. 79 ("[HERNANDEZ:] Ms. Trzaskoma, if the government had not inquired about your firm's knowledge about certain facts that you had about Catherine Conrad, were you ever going to disclose that information to the Court? [TRZASKOMA:] I don't know I can answer that. . . . It didn't occur to me to disclose it. As I said, I regret that. But I can't say that it wouldn't have come up subsequently."); Hr'g Tr. 317 ("COURT: Ms. Brune, . . . would your firm have disclosed the information in your firm's July 21 letter and the investigation into Juror No. 1 if the Court had not inquired or the government failed to raise the waiver issue? [BRUNE]: I don't think we would have your Honor[.]"); Hr'g Tr. at 357 ("OKULA: [A]re you saying that you would have felt comfortable that you had fulfilled all your obligations if the Court had decided this motion without learning of the facts concerning what your firm knew prior to receiving the [May Letter]? Yes or no. [EDELSTEIN]: Yes.").)

Daugerdas, 867 F.Supp.2d at 459-60.

In addition to the testimony from Parse's attorneys at the February 2012 hearing, the district court had before it a series of internal firm emails produced by Brune & Richard pursuant to an August 2011 order granting a motion by the government for discovery of documents relating to the

firm's prior investigations of Conrad.  Emails discussing information gathered by a jury consultant firm ("Nardello") reflected the B&R grading system for prospective jurors, in which a "D" signified somewhat unlikely to be pro-defense and a "Z" meant that no meaningful information was available. The district court noted that the following emails were exchanged among B&R personnel on May 12, 2011, i.e., the day on which jury deliberations began, which was the day after the parties were informed of Conrad's inquiry to the court about respondeat superior and vicarious liability:

> 7:25 a.m.:  Trzaskoma requests that her team "send [her] all of our intelligence on juror # 1, including pre-voir dire info we thought we had."

> 7:54 a.m.:  Paralegal David Benhamou e-mails Trzaskoma a summary of Conrad's answers during voir dire.

> 8:02 a.m.:  Vivian Stapp, an associate at Brune & Richard, responds to Benhamou's email regarding the lack of information in their files.  She observes:  "We don't have Nardello info gathered for her.  She was initially given a 'Z' grade and then it looks like we gave a 'D' at some point, probably because we thought she was that lawyer.  Unfortunately we don't have anything else for her.  I'll keep looking but that's what the spreadsheet is showing.  A little more:  'is a plaintiff in a pending personal injury case in South Bronx Division.'"

> 10:55 a.m.:  Trzaskoma advises Benhamou, "What we found before voir dire was that maybe she was a suspended lawyer."

> 11:06 a.m.:  Randall Kim, an associate at Brune & Richard, replies to Stapp:  "We (I thought TT [Trzaskoma]) found something more, which more clearly suggested she has been/is and [sic] alcoholic."

> 11:07 a.m.:  Benhamou sends Kim, Stapp, and Trzaskoma the link to the 2010 Suspension Order.

> 11:13 a.m.:  Stapp then observes to Kim, "We have Conrad down as a 'Do Not Search.'  I don't think she's that lawyer, unless she blatantly omitted information during voir dire when describing her educational background (or was able to become a lawyer without going to law school.)"

> 11:15 a.m.:  Benhamou, at Trzaskoma's request, sends Trzaskoma,

Kim, and Stapp an excerpt of Conrad's voir dire testimony.

11:17 a.m.: After reviewing Conrad's voir dire testimony, Trzaskoma instructs Benhamou, Kim, and Stapp to keep a dossier on Conrad, by noting: "Ok, unless Conrad totally lied about her highest level of education, it can't be the same person as the suspended lawyer. But let's keep a little dossier on her."

11:22 a.m.: Benhamou asks Trzaskoma if she wants him to "do a people search on Westlaw," and she responds less than one minute later, "Sure."

2:24 p.m.: Benhamou sends Trzaskoma the Westlaw Report with the following message: "Attached is a Westlaw report. I picked the Catherine M. Conrad who has an address in Bronxville, which seemed to match her testimony. Westlaw thinks this is the same suspended lawyer from the Bronx, but perhaps it's confusing two people or I picked the wrong one. If you really care about this, I suggest you have Nardello run this down as I'm not too sure what I'm doing here." Benhamou then went on to describe some of the information in the Westlaw Report, including the reference to a "Robert J. Conrad."

2:32 p.m.: Trzaskoma responds to Benhamou: "I think Robert Conrad is her father--he is an immigration judge."

2:36 p.m.: Trzaskoma shares with Benhamou: "<u>Jesus, I do think that it's her</u>. Can you please track down that lawsuit?" (Emphasis added).

<u>Daugerdas</u>, 867 F.Supp.2d at 463-64 (footnotes omitted).

The district court concluded:

Any fair reading of these e-mail exchanges shows that Parse's attorneys had actionable intelligence that Conrad was an imposter. That knowledge demanded swift action to bring the matter to the Court's attention. Further investigation would have been easy and prudent. But Parse's attorneys chose to do neither.

In her September 15 affidavit, Brune asserts that sometime after 2:36 p.m., Trzaskoma shared with her and Edelstein the possibility that the suspended lawyer and Juror No. 1 were the same person. (Brune Aff. ¶ 12.) While now armed with the Westlaw Report, Brune, Trzaskoma, and Edelstein nevertheless adhered to their earlier conclusion during voir dire, namely that

21

"Ms. Conrad could be a suspended lawyer only if she had lied repeatedly during voir dire, and it seemed inconceivable that any juror, much less a lawyer, would perjure herself so brazenly." (Brune Aff. ¶ 12.) Through that rationalization, Parse's attorneys convinced themselves that "no additional research was warranted, and none was conducted." (Brune Aff. ¶ 12.) Missing from the Brune Affidavit are any particulars about Parse's attorneys' thought processes in the wake of the newly acquired Westlaw Report, Benhamou's professed uncertainty with his research and, most importantly, Trzaskoma's epiphany just hours earlier that Juror No. 1 was the suspended attorney with alcohol issues ("Jesus, I do think that it's her"). Moreover, Brune's Affidavit provides no details about whether Parse's attorneys discussed alerting the Court to their investigation, nor does it explain why they did not ask the Nardello firm to investigate Juror No. 1 immediately.

Daugerdas, 867 F.Supp.2d at 464-65.

The district court noted that thereafter, at the February 2012 Hearing,

Brune & Richard offered another layer of detail about the events of May 12. Trzaskoma acknowledged reviewing the Westlaw Report after Benhamou sent it to her that morning. (See Hr'g Tr. 49-50 ("It struck me that holy cow, it's possible that it's the same person, and I was looking at the Westlaw report to try to figure out is there some way that this tells me one way or the other, that gives me more information.").) But she testified that she did not look at the Westlaw Report until after sending the "Jesus" e-mail and she minimized its significance on her thought process. (Hr'g Tr. 55-56.) Citing her inexperience in reading such reports, Trzaskoma claimed that she questioned the Westlaw Report's accuracy and whether it had aggregated information about multiple Catherine Conrads. (Hr'g Tr. 49-55.) Trzaskoma offered no explanation for her failure to seek assistance from her colleagues. She also quibbled over whether Juror No. 1 physically appeared to be a woman in her early forties (maintaining that she believed Juror No. 1 to be "close to 50"). And even though she was looking for correlations to Juror No. 1, she "did not focus on the [middle initial] 'M'" and she "didn't think of it" as a way to help her narrow down the information in the Westlaw Report. (Hr'g Tr. 24, 50).

Daugerdas, 867 F.Supp.2d at 465.

The court noted that Trzaskoma said she and her partners met briefly on May 12 in Foley Square Plaza, just outside the courthouse but did not discuss the new information:

Notwithstanding her Eureka e-mail a few hours earlier--"Jesus, I do think that

22

it's her"--Trzaskoma claimed that when she met with her partners, she did not think that Conrad and the suspended attorney were the same person, but raised only the "possibility" that there might be a connection. (Hr'g Tr. 58, 92, 280.) Trzaskoma never shared the existence of the Westlaw Report or its contents with Brune or Edelstein. Indeed, all three Brune & Richard partners testified in unison that they never mentioned, let alone discussed, the Westlaw Report in their Foley Square conversation. (Hr'g Tr. at 58-59, 281, 328.) Brune made the point emphatically: "I'm confident that [Trzaskoma made no mention whatsoever of the Westlaw Report], and here is why. Laurie Edelstein is the kind of person who will always kind of say, well, show me the case, show me the document. She is extremely thorough and if [Trzaskoma] had referenced the document in the conversation, that's what Ms. Edelstein would have said. So I know that there was no reference to [the Westlaw Report] in the conversation." (Hr'g Tr. 281.) In exploring the basis for Trzaskoma's rekindled belief that Conrad could be the suspended attorney, Parse's attorneys only considered the Juror Note and the transcript of Conrad's voir dire testimony. (Hr'g Tr. 58-59, 281, 328.) Further, according to Brune's and Edelstein's testimony, Trzaskoma never mentioned the Westlaw Report or the May 12 internal e-mails about Brune & Richard's research of Conrad at any point during the eleven days of jury deliberations. (Hr'g Tr. 59, 281.)

Daugerdas, 867 F.Supp.2d at 465-66.

## C. The Granting of a New Trial to Daugerdas, Guerin, and Field

The district court, discussing the relevant Supreme Court cases, including McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548 (1984) ("McDonough"), and courts of appeals cases, noted that the Sixth Amendment guarantees an accused the right to a trial by an impartial jury. "An impartial jury is one in which every juror is 'capable and willing to decide the case solely on the evidence before [her].'" Daugerdas, 867 F.Supp.2d at 470 (quoting McDonough, 464 U.S. at 554). "Voir dire plays an essential role in protecting the right to a trial by an impartial jury," and as questioning on voir dire seeks to ferret out actual or potential biases on the part of potential jurors, a "juror's dishonesty during voir dire undermines a defendant's right to a fair trial." Daugerdas, 867

23

F.Supp.2d at 468.

> "If the answers to the questions [during voir dire] are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. . . . His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham." Clark v. United States, 289 U.S. 1, 11, 53 S.Ct. 465, 77 L.Ed. 993 (1933); see also McDonough, 464 U.S. at 554, 104 S.Ct. 845 ("The necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious."). Thus, a juror who lies her way onto a jury is not really a juror at all; she is an interloper akin "to a stranger who sneaks into the jury room." Dyer v. Calderon, 151 F.3d 970, 983 (9th Cir. 1998) (en banc). "Justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

Daugerdas, 867 F.Supp.2d at 468; see also id. ("where a juror deliberately conceals information that, if revealed, 'might thwart her desire to sit' on the jury, any resulting conviction 'cannot stand' because such conduct 'obstruct[s] the voir dire and indicate[s] an impermissible partiality on the juror's part'" (quoting United States v. Colombo, 869 F.2d 149, 151 (2d Cir. 1989) ("Colombo"))).

The district court noted that a potential juror should be discharged when there is actual bias, implied bias, or inferable bias. In this case, it found all three bias categories applicable to bar Conrad from serving on the jury. "Whether a juror is actually biased is a question of fact," Daugerdas, 867 F.Supp.2d at 470; and, as described in Part I.A.3. above, the court found that Conrad was in fact biased against these defendants, see id. at 471. "Implied bias," in contrast,

> is determined as a matter of law and attributed to a prospective juror regardless of actual partiality. . . .

> Courts imply bias in extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances. . . .

> Significantly, courts imply bias where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury. . . . A juror . . . who lies materially and repeatedly in response to

24

legitimate inquiries about her background introduces destructive uncertainties into the process.

Daugerdas, 867 F.Supp.2d at 472 (internal quotation marks omitted) (emphases ours). "The nature, scope and extent of the lies a juror tells may, in and of themselves, demonstrate an undue partiality or bias. . . . Therefore, dishonest answers are a factor that can contribute to a finding of implied bias." Id. at 473. "Where a juror is impliedly biased, disqualification of that juror is mandatory." Id. at 472. The court concluded:

> The principle of implied bias applies with particular force here. Not only did Conrad lie, she created a totally fictitious persona in her drive to get on the jury. Few, if any, prospective jurors would willfully violate their oath, and knowingly subject themselves to prosecution for perjury, without a strong personal interest in the outcome of the case. See Colombo, 869 F.2d at 151. Conrad did not tell a discrete lie or two. Rather, she presented herself as an entirely different person and lied about virtually every detail of her life . . . . And as a lawyer, she had to appreciate the consequences of lying under oath. . . . Anyone so anxious to serve on a jury that she would misrepresent who she is, and risk criminal prosecution by doing so, see 18 U.S.C. § 1621, cannot be considered impartial. Someone who commits fraud to get on a jury cannot evaluate the credibility of witnesses, much less sit in judgment of others who are accused of fraud.

Daugerdas, 867 F.Supp.2d at 473 (emphases added). The court concluded:

> The brazenness of Conrad's deliberate lies and her demonstrated inability to distinguish truth from falsehood added destructive uncertainty to the fact-finding process. . . . Accordingly, this Court concludes that Conrad was impliedly biased.

Id. at 474 (internal quotation marks omitted).

Finally, the court noted that a juror may be discharged when bias is "'inferred'": "'Inferable' or 'inferred' bias exists "'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias.'"" Id. (quoting United States v. Greer, 285

25

F.3d 158, 171 (2d Cir. 2002) ("Greer") (quoting United States v. Torres, 128 F.3d 38, 47 (2d Cir. 1997) ("Torres"), cert. denied, 523 U.S. 1065 (1998))). And "'once facts are elicited that permit a finding of inferable bias, then, just as in the situation of implied bias, the juror's statements as to his or her ability to be impartial become irrelevant.'" Daugerdas, 867 F.Supp.2d at 474 (quoting Torres, 128 F.3d at 47); see also Greer, 285 F.3d at 171. Here, the court concluded:

> Had this Court known the facts, Conrad would have been subject to a valid challenge for cause. She was manifestly incapable of performing the central functions of a juror--evaluating witness credibility and making a fair assessment of the evidence. Solely on the basis of her false voir dire testimony, the Court could easily infer that she is inherently unable to perform the crucial function of ascertaining the truth. The fact is, however, that there is a mountain of other evidence showing that not only did she lie to this Court on voir dire, but that she is a pathological liar who does not know the difference between truth and lie. The presence of such a tainted juror, who cannot appreciate the meaning of an oath is simply intolerable.

Daugerdas, 867 F.Supp.2d at 475 (emphasis added).

> Conrad's actions in this case, as well as in other lawsuits in which she has participated, "evinces a shocking disregard for the judicial system[.]" 2007 Suspension Order, 48 A.D.3d at 188, 846 N.Y.S.2d 912. In addition to her serial perjury, Conrad's direct defiance of the Court and its orders, as well as her statements at the December 20 and February 15 hearings, betray a fundamental contempt for the judicial process. She advised the Court at the December 20 hearing that there was no point in holding a hearing because the Defendants are "fricken crooks and they should be in jail." (12/20 Tr. at 17.)

Daugerdas, 867 F.Supp.2d at 475; see also id. at 475-76 (recounting Conrad's contumacious and bizarre behavior throughout the posttrial proceedings). The court concluded:

> Such a person has no business sitting on a jury in judgment of others. Accordingly, had this Court known the full extent of Conrad's character at voir dire, it would have exercised its discretion and inferred that she was biased.

Id. at 476. It noted that, although the Second Circuit had never found reason to overturn a verdict on the basis of juror nondisclosure under McDonough, here "the exceptional circumstances--deliberate

26

lies engineered to create a fictitious, 'marketable' juror--presented by this case warrant such extraordinary relief." Daugerdas, 867 F.Supp.2d at 468.

Having seen no reason to believe that Daugerdas, Guerin, Field, or their respective attorneys had knowledge or suspicions as to Conrad's misconduct prior to the end of the trial, see id. at 459, 462 n.6, the court concluded that Daugerdas, Guerin, and Field were entitled to a new trial.

D. The Denial of a New Trial for Parse

In contrast, the district court concluded that Parse had waived his right to a new trial. Despite the argument that Parse himself had had no knowledge of Conrad's falsehoods, the court stated that it "bears noting at the outset that a defendant can waive certain rights through the actions of his attorneys, even if the defendant himself was unaware of the circumstances and actions giving rise to the waiver." Daugerdas, 867 F.Supp.2d at 476. The court concluded that "Parse . . . is bound by Brune & Richard's actions and decisions at trial," id. at 477, stating that

> a defendant waives his right to an impartial jury if defense counsel were aware of the evidence giving rise to the motion for a new trial or failed to exercise reasonable diligence in discovering that evidence. To be sure, actual knowledge of facts disqualifying a juror is an absolute bar to any challenge to that juror after a verdict. McDonough, 464 U.S. at 551 n. 2, 104 S.Ct. 845 (party who had knowledge "would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the suspected juror] further upon receiving an answer which they thought to be factually incorrect"),

Daugerdas, 867 F.Supp.2d at 479 (emphases ours). The district court noted that the McDonough Court, in making the above-quoted statement, had cited Johnson v. Hill, 274 F.2d 110, 115-16 (8th Cir. 1960) ("Johnson"), in which the Eighth Circuit had stated as follows:

> The right to challenge the panel or to challenge a particular juror may

be waived, and in fact is waived by failure to seasonably object. . . . It is established that failure to object at the time the jury is empaneled operates as a conclusive waiver if the basis of the objection is known or might have been known or discovered through the exercise of reasonable diligence, or if the party is otherwise chargeable with knowledge of the ground of the objection.

274 F.2d at 116 (internal quotation marks omitted) (emphasis ours).  The district court stated:

> As Johnson and subsequent cases make clear, litigants and their counsel must act with reasonable diligence based on information about juror misconduct in their possession, or they will be deemed to have waived their right to an impartial jury based on the challenged juror misconduct.

Daugerdas, 867 F.Supp.2d at 480; see also id. at 476-80 (discussing additional cases from other circuits).

In the present case, the district court found that Parse's attorneys knew that Conrad was a suspended attorney--or at least they would have known had they exercised due diligence:

> Brune, Edelstein, and Trzaskoma all testified that, after Trzaskoma raised her concern about Conrad during their Foley Square conversation, they discussed Conrad's voir dire answers, and observed that Conrad's odd note about vicarious liability and respondeat superior could be explained as relating to her personal injury lawsuit, which Conrad had mentioned during voir dire. (Hr'g Tr. 38, 60, 280.)  On that slender reed, they unilaterally decided that no further investigation was necessary--even though Trzaskoma recalled mentioning that they should have an investigator look at the issue:  "what I thought at the time was that we would need to investigate." (Hr'g Tr. 60, 92.) Trzaskoma asked Brune whether they should keep looking at the issue, and Brune told her "no, just leave it." (Hr'g Tr. 60, 283.)  According to Brune, she shut down further inquiry because she credited Conrad's voir dire responses. But she also acknowledged that Parse's trial team had not taken any additional steps to rule out that Conrad was the suspended lawyer. (Hr'g Tr. 282.)  This Court cannot fathom how lawyers as thorough as Brune, Edelstein, and Trzaskoma would neglect to tie off such a glaring loose end.
>
> Acting on Brune's instruction to "leave it," Trzaskoma directed Benhamou to "stand down" on his efforts to obtain records of the civil lawsuit referenced in the Westlaw Report. (Hr'g Tr. 93.)  Edelstein added that she, Brune, and Trzaskoma specifically discussed whether they should bring the issue to the Court's attention, and decided against it because she thought it was

28

"inconceivable" that Conrad had lied. (Hr'g Tr. 354-55.) This was another tragic misjudgment.

Paul Schoeman, Brubaker's counsel, testified that some time after the receipt of the Juror Note on May 11, and likely the Monday thereafter, Trzaskoma told him that there was a suspended attorney named Catherine Conrad, but that Parse's attorneys had concluded that Juror No. 1 was not that person. (Hr'g Tr. 362-65.) Trzaskoma did not mention the Westlaw Report or other information Brune & Richard unearthed. Barry Berke, another attorney for Brubaker, testified to a similar conversation with Brune. (Hr'g Tr. 368-69.)

In sum, prior to the start of voir dire, Parse's attorneys knew that (1) Juror No. 1 lived in Bronxville, was a plaintiff in a pending personal injury lawsuit, and had a father who was an immigration officer; and (2) a woman with the identical name of "Catherine M. Conrad" was a suspended New York attorney with an alcohol dependency.

Before jury deliberations began, Parse's attorneys knew that (1) Juror No. 1 had submitted a note to the Court referencing several legal concepts not mentioned during the trial; (2) the suspended New York attorney by the name of Catherine M. Conrad used a Bronxville address, the same small village given for Juror No. 1 on the jury roll, and (3) that living in the same household was a Robert J. Conrad, whom Trzaskoma believed to be Conrad's father, the immigration judge. And Trzaskoma had concluded that the Catherine M. Conrad in the Westlaw Report was the same person as Juror No. 1.

Daugerdas, 867 F.Supp.2d at 466 (emphases ours).

Thus, the court concluded that

the facts adduced at the Hearing and from Brune & Richard's serial disclosures show that counsel for Parse believed that Juror No. 1 was the suspended New York attorney named Catherine M. Conrad. First, Trzaskoma, the Brune & Richard partner who oversaw and coordinated juror research, demonstrated her knowledge through the simple, declarative language of her e-mail on May 12, 2011: "Jesus, I do think that it's her." Trzaskoma based her declaration on a considerable body of evidence: (1) the Appellate Division's 2010 Suspension Order suspending attorney "Catherine M. Conrad" for alcohol-related issues; and (2) the Westlaw Report describing a "Catherine M. Conrad" who (i) resided in Bronxville, among other places; (ii) was forty-one years of age; (iii) participated in a lawsuit involving "Saranta Foods Ltd., Unity Coffee," pending in Bronx Supreme Court; (iv) was associated with a Robert J. Conrad, whom Trzaskoma identified in an[] email as "an immigration judge" (Hr'g Tr. 46-47);

29

and (v) was a suspended New York attorney. This information--which Trzaskoma reviewed in a sustained back-and-forth with her colleagues at Brune & Richard--amply supports her vivid declaration that Juror No. 1 was suspended attorney Catherine M. Conrad.

Daugerdas, 867 F.Supp.2d at 480 (emphases and brackets ours).

Other Brune & Richard lawyers acknowledged that Trzaskoma had drawn a strong link between the Catherine M. Conrad described in the 2010 Suspension Order and the Catherine M. Conrad seated as Juror No. 1. In particular, Brune & Richard attorney Randy Kim noted in a May 12 e-mail that Trzaskoma had previously reviewed data that "clearly suggested" that Conrad was an alcoholic, which reflects Trzaskoma's pre-voir dire review of the 2010 Suspension Order. (See Brune Aff. Ex. J at 86: May 12, 2011 E-mail from Randy Kim to Vivian Stapp ("We (I thought TT [Theresa Trzaskoma]) found something more; which more clearly suggested she has been/is and [sic] alcoholic.").) And in yet another May 12 e-mail, Trzaskoma herself acknowledged the pre-voir dire connection she had drawn between Conrad and the person depicted in the 2010 Suspension Order. (See Brune Aff. Ex. J at 86: E-mail from Trzaskoma to paralegal David Benhamou ("What we found before voir dire was that maybe she was a suspended lawyer.").)

Daugerdas, 867 F.Supp.2d at 480 (emphases ours).

The court also stated that inconsistencies in representations made and positions taken by Parse's attorneys evinced a lack of candor that suggested they had actually known that Conrad was the suspended attorney:

The actions of Parse's attorneys in connection with the new trial motion further support the conclusion that they knew that Conrad was the subject of the 2010 Suspension Order. First, Trzaskoma's statement to the Court on July 15, 2011 that "we were not aware of the facts that have come to light" was not entirely candid. One of the facts that purportedly "came to light" was the 2010 Suspension Order, which Defendants identified as one basis for their new trial motion. Parse's attorneys possessed those facts prior to voir dire, and, indeed, Trzaskoma admitted that she had reviewed the 2010 Suspension Order, and discussed it with Brune and their jury consultant, prior to Conrad's individual voir dire. What is more, Trzaskoma's purported ignorance cannot be reconciled with the additional evidence that Parse's defense team uncovered and reviewed at Trzaskoma's behest.

30

Similarly, Defendants' Brief, which Trzaskoma drafted and Brune and Edelstein edited, contained two significant factual misstatements pertaining to their knowledge about Conrad. First, in its description of how the Defendants learned of Conrad's true identity, Defendants' Brief suggests that they began to collect and review documents and information pertaining to Conrad's background only after receiving Conrad's May Letter. (See Def. Br. at 9 ("The tone and content of [Conrad's May Letter], . . . caused defendants concern and prompted them to investigate[.]").) Second, Defendants represented they "had no basis to inquire whether Conrad was lying in response to each of the Court's questions [during voir dire]." (Def. Br. at 32 n. 13.) But those statements are at odds with the facts that emerged after this Court inquired and the Government pursued discovery. At a minimum, Trzaskoma had reviewed the 2010 Suspension Order prior to voir dire and thus possessed information indicating that a "Catherine M. Conrad" was a suspended attorney. That alone was a basis to inquire whether Conrad was lying during voir dire.

In addition, Parse's attorneys resisted the Court's and the Government's attempt to discover the full extent of their research into Conrad. In resisting that discovery, Brune raised a legal argument that directly contradicted her earlier representations to the Court. During the August 8, 2011 conference, Brune argued against well-settled law that "there is a split in the federal circuits about whether the fundamental right to an impartial jury can ever be waived," and asked the Court to address that legal issue before allowing any discovery. (8/8 Tr. 11.) Yet, in attempting to explain why Brune & Richard omitted their extensive pre-verdict investigation of Conrad from Defendants' Brief, Brune stated that "we certainly anticipated that the government was going to raise the issue of waiver, it features prominently in the Supreme Court case that controls here[.]" (7/15 Tr. 6.) Such cognitive dissonance is unsettling. It also belies Brune's characterization of their decision not to disclose their pre-verdict investigation in their brief. This Court declines to credit Brune's dismissive claims that her law firm "kind of missed it" and that she "never imagined that . . . [it] was going to assume the debate level prominence that it has here. I missed the issue and I really regret that." (Hr'g Tr. 292-93.)

Only after this Court directed Parse's attorneys to comply with the Government's discovery requests and after this Court advised counsel that it would conduct an in camera review of their assertions of the attorney work product privilege, did Brune & Richard produce documents relating to their research of Conrad, including Trzaskoma's May 12 "Jesus" e-mail. The import of Parse's attorneys' conduct is that they attempted to foreclose an inquiry into their pre-verdict knowledge of Conrad and ward off any anticipated "due diligence" argument by the Government. Ultimately, their post-hoc explanations suggest an acute concern about the implications to their client's

31

legal position if the Court were to learn the true facts.

Finally, Trzaskoma's attempt during the Hearing to distance herself from the language of her own May 12 e-mail was unpersuasive. There is simply no convincing way to morph her vivid affirmation of belief--"Jesus, I do think that it's her"--into a statement of "possibility," "remote possibility," or "potential[ity]." (Hr'g Tr. 43, 59, 62.) Trzaskoma's knowledge of Conrad's identity was far deeper than a mere "possibility," as shown by her review of the 2007 and 2010 Suspension Orders and the Westlaw Report. That report, as noted above, contained a number of connections to Juror No. 1, including a Bronxville address, Conrad's age, the pendency of a lawsuit in Bronx Supreme Court, and a reference to a person Trzaskoma recognized as Conrad's father.

Moreover, Benhamou presented Trzaskoma with the information from the Westlaw Report just four minutes before she declared, "Jesus, I do think that it's her." Her immediate, unvarnished reaction is tantamount to an excited utterance. While usually employed as an exception to the hearsay rule, the well-recognized reliability of excited utterances applies equally in this context. See United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998) ("The rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability."). Trzaskoma made her statement in reaction to the explosive information contained in the Westlaw Report and without the benefit of time to deliberate and reflect on the consequences of her statement. Thus, her spontaneous declaration is a reliable indication of her state of mind precisely when the Court was sending its instructions, a list of exhibits, and a redacted copy of the indictment into the jury room so that Conrad, and her fellow jurors, could begin their deliberations.

In sum, the facts fully support that Trzaskoma, on behalf of Parse, was aware during trial that Juror No. 1 was the suspended New York attorney Catherine M. Conrad. That knowledge, possessed by Parse's attorney who acted as the point person in Brune & Richard's jury research process, waives Parse's claim of juror misconduct.

Daugerdas, 867 F.Supp.2d at 480-82 (footnote omitted) (emphases ours).

The court found alternatively, that even if B&R did not have actual knowledge that Conrad was the suspended attorney, they would have known had they exercised due diligence:

Even if this Court were to conclude that Parse's counsel did not know that Juror No. 1 was the suspended New York attorney Catherine M. Conrad,

32

> this Court would still find waiver appropriate because the facts overwhelmingly paint a picture of a glaring lack of reasonable diligence by Parse's attorneys.
>
> As an initial matter, Parse's contention that a lack of reasonable diligence cannot constitute a waiver is wrong as a matter of law, and does not comport with basic principles of a fairly functioning judicial process. The waiver doctrine exists to ensure that the Court receives information in time to make inquiries, remedy potential prejudices, and save all concerned the time, expense, and efforts of a retrial.

Id. at 482 (emphases added). The court continued:

> A waiver standard predicated solely on actual knowledge, to a 100% certainty, would result in retrials where defense attorneys had substantial information of juror misconduct that put them on reasonable notice that the Court should be notified and additional inquiry undertaken. Parse's position is inconsistent with the institutional imperative of ensuring that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences. . . . Stated simply, to avoid waiver, Parse's attorneys were required to act with reasonable diligence both after they learned about the 2010 Suspension Order prior to voir dire and after they obtained the Westlaw Report on May 12, 2011--the day jury deliberations started. But they did not. Parse's attorneys were on sufficient notice and they should have raised their concerns with the Court at voir dire and then again at the beginning of jury deliberations. At the very least, they should have taken additional steps to acquire sufficient information to make an informed decision. Their failure to do so constitutes a waiver.

Id. at 482-83 (internal quotation marks omitted) (emphases ours).

The court rejected Parse's attorneys' explanation that they had relied on Conrad's voir dire answers in rejecting the possibility that Conrad was the suspended lawyer:

> Parse's attorneys argue that they reasonably relied on Conrad's voir dire answers, but this excuse is unpersuasive. First, with the 2010 Suspension Order in hand during voir dire, they could have asked the Court to pose a direct question to Juror No. 1 about whether she was the "Catherine M. Conrad" referenced in the order. Indeed, Brune acknowledged that if the person in the suspension opinion were the same person as Juror No. 1, that would be "very significant information" and "it was certainly going to be significant to Judge Pauley if it was the same person." (Hr'g Tr. 265). But Parse's attorneys chose

33

not to ask the Court to inquire of Juror No. 1 about the 2010 Suspension Order. That decision flies in the face of Brune's argument at a pretrial conference about the need for an extensive juror questionnaire: "What's the harm in asking additional questions?" (Dec. 8, 2010 Transcript 35.) That Parse's attorneys failed to heed their own advice when it mattered most speaks volumes.

Second, on May 12, Parse's attorneys failed to exercise reasonable diligence by deciding not to do any additional research or investigation and deciding not to notify the Court when faced with mounting evidence that Juror No. 1 was a suspended New York attorney. Brune claims that, at that point in time, she did not know one way or the other whether Juror No. 1 was the suspended attorney. (Hr'g Tr. 283-84). But, at a minimum, Parse's attorneys possessed information that could not be reconciled without additional investigation. Trzaskoma recognized this on May 12 when she exclaimed, "Jesus, I do think that it's her," and she reasonably concluded that additional investigation was needed. (Hr'g Tr. 62, 92.) Specifically, she instructed Benhamou to gather information about the civil lawsuit referenced in the Westlaw Report.

Unfortunately, before Benhamou located information about the lawsuit, Brune, Edelstein, and Trzaskoma decided not to pursue it. During their May 12 conversation in Foley Square Plaza, they discussed at least two of the options available to them that could have reconciled the conflicting information in their possession--further investigation or alerting the Court. Together they rejected both options without first learning from Trzaskoma, much less discussing, the factual basis behind Trzaskoma's earlier conviction. Rather, they chose a course that was guaranteed to leave the issue unresolved. By choosing to do nothing, Parse's attorneys failed to exercise reasonable diligence in view of the information they possessed before the jury began deliberations.

There were, of course, some simple steps that could easily have shed light on whether Juror No. 1 was the suspended attorney. Parse's attorneys could have compared Conrad's name on the jury selection panel report with the name listed in the Suspension Orders, which showed that Juror No. 1 shared the same middle initial as the suspended attorney. They could have visited the New York State Bar's website and located Catherine Conrad's listing, which would have shown that she had the same address as one of the addresses listed in the Westlaw Report. They could have consulted with the Government, whom Brune acknowledged had "pretty good investigators and . . . access to more information than I do[.]" (Hr'g Tr. 320-21.) They could have requested that Nardello, their private investigator, make further inquiry. See United

34

States v. Rodriguez, 182 F.3d 902 (2d Cir. 1999) (table) (rejecting Rule 33 motion where defense counsel failed to investigate); see also United States v. Slutsky, 514 F.2d 1222, 1225 (2d Cir. 1975) (denying motion for a new trial where defendants "knew, or at the very least with the exercise of due diligence should have known, of the existence of . . . exculpatory evidence and its ramifications").

Daugerdas, 867 F.Supp.2d at 483-84 (emphases ours).

The district court stated that, most importantly, Parse's attorneys had enough information that they could have sought guidance from the court while they continued their investigation. See id. at 484.

Instead, Parse's attorneys usurped the judicial prerogative by substituting their judgment for the Court's. Their stated reason--"we relied on voir dire answers"--is wholly inadequate in view of their awareness of information casting strong doubt on those answers. And it is especially deficient when much of the information relating to Conrad was reflected in public records that Parse's attorneys possessed prior to the jury verdict. In sum, Parse's attorneys' knowledge of Conrad's deception and their lack of reasonable diligence in acting on that knowledge warrants finding a waiver.

Id. (emphases ours).

Jury selection is integral to the organization of a trial. As officers of the court, attorneys share responsibility with a judge to ensure the integrity of the proceedings. In this respect, counsel and the court are joint venturers. An attorney's duty to inform the court about suspected juror misconduct trumps all other professional obligations, including those owed a client. Any reluctance to disclose this information--even if it might jeopardize a client's position-- cannot be squared with the duty of candor owed to the tribunal.

At a minimum, Parse's attorneys had a suspicion that Juror No. 1 was not the person she represented herself to be during voir dire. That suspicion leavened into tangible evidence that Conrad was a monstrous liar. And Parse's attorneys knew--or with a modicum of diligence would have known--of Conrad's misconduct before the jury rendered its verdict. But they gambled on the jury they had. Accordingly, Parse's attorneys' failure to bring Conrad's misconduct to the attention of the Court leads to the anomalous, but entirely just, result that Daugerdas, Guerin, and Field's motion for a new trial is granted, while Parse's is denied.

35

Daugerdas, 867 F.Supp.2d at 484-85 (emphases added).

## II. DISCUSSION

On appeal, Parse contends that he is entitled to a judgment of acquittal on the two counts on which he was found guilty, arguing that the evidence at trial was insufficient to support his conviction. (See Parse brief on appeal at 73-82, 94-96.) Alternatively, he contends, inter alia, that the district court abused its discretion in denying his Rule 33(a) motion for a new trial on those counts, either (a) because he was deprived of his constitutional right to be tried before an impartial jury, or (b) because, if his attorneys waived that right by remaining silent despite juror bias, he was deprived of his constitutional right to effective assistance of counsel. (See id. at 19-73.) For the reasons that follow, we reject Parse's challenge to the sufficiency of the evidence (see Part II.B below), but we conclude that he should have been granted a new trial on the ground that he was deprived of the right to a trial before an impartial jury.

A. The Denial of Parse's Motion for a New Trial

Rule 33 of the Federal Rules of Criminal Procedure provides, in pertinent part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Such a motion, if made within three years after the verdict or finding of guilty, may be based on "newly discovered evidence," Fed. R. Crim. P. 33(b); but such motions are "not favored," United States v. Diaz, 176 F.3d 52, 106 (2d Cir.) (internal quotation marks omitted), cert. denied, 528 U.S. 875 (1999); United States v. Spencer, 4 F.3d 115, 118 (2d Cir.

36

1993) ("Spencer"); see, e.g., United States v. Slutsky, 514 F.2d 1222, 1225 (2d Cir. 1975).

Evidence is not new if the defendant knew of it prior to trial, see, e.g., United States v. Mayo, 14 F.3d 128, 132 (2d Cir. 1994) ("Mayo"), and is not considered "newly discovered" if, with the exercise of reasonable diligence, it could have been discovered before or during the trial, see, e.g., United States v. Siddiqi, 959 F.2d 1167, 1173 (2d Cir. 1992) ("Siddiqi") (the defendant must "make[] a showing that the evidence is in fact 'new', i.e., it could not have been discovered, exercising due diligence, before or during trial"); Spencer, 4 F.3d at 119. A defendant is not entitled to remain silent while having knowledge of facts of an impropriety that would entitle him to relief and to invoke that impropriety only later if the result of the proceeding is unsatisfactory to him. See generally Puckett v. United States, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. . . . [T]he contemporaneous-objection rule prevents a litigant from 'sandbagging' the court--remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." (other internal quotation marks omitted)).

Thus, a motion for a new trial based on a claim of newly discovered evidence generally should not be granted unless, inter alia, the evidence was in fact newly discovered after trial, and facts are alleged from which the court can infer the exercise of due diligence on the part of the movant to obtain the evidence prior to the end of the trial. See, e.g., United States v. Ragland, 375 F.2d 471, 475 (2d Cir. 1967) ("To give an accused a second trial each time he doubts, after an unfavorable verdict, the objectivity of jurors, would seriously impede the processes of justice."), cert. denied, 390 U.S. 925 (1968); United States v. Diaz-Albertini, 772 F.2d 654, 656 (10th Cir. 1985) (where a juror failed to disclose his close ties with law enforcement officials and a new trial was granted to the defendant wife

37

who had no knowledge of that nondisclosure, affirming the denial of a new trial to the defendant husband, whose attorney testified that when he was informed of the nondisclosure prior to trial, "he decided at th[at] time" that he would later raise the issue "should we have a conviction" (internal quotation marks omitted)), cert. denied, 484 U.S. 822 (1987); id. at 657 (a "litigant cannot transform a tactical decision to withhold the information from the court's attention into a trump card to be played only if it becomes expedient"); United States v. Bolinger, 837 F.2d 436, 439 (11th Cir.) (affirming denial of a new trial where defendant's attorney learned of juror misconduct during trial and "gamble[d] on the jury rather than inform[ing] the court of the problem in time to allow the court to determine if corrective action was possible prior to verdict"), cert. denied, 486 U.S. 1009 (1988); United States v. Morris, 977 F.2d 677, 686 (1st Cir. 1992) ("We will not allow counsel to stand by quietly and gamble on a favorable verdict, only to complain when it turns out to be otherwise."), cert. denied, 507 U.S. 988 (1993).

In sum, if the defendant knew prior to the end of trial that a prospective juror had given false voir dire responses and did not then reveal the disqualifying falsehoods or nondisclosures to the court, the "interest of justice," Fed. R. Crim. P. 33(a), generally will not require a new trial.

In addition, even if the evidence was newly discovered within the meaning of Rule 33(b), that evidence must, in order to warrant a new trial, be "material," not merely cumulative. United States v. Persico, 645 F.3d 85, 109 (2d Cir.) ("Persico"), cert. denied, 132 S. Ct. 593 (2011); United States v. Owen, 500 F.3d 83, 87-88 (2d Cir. 2007) ("Owen"), cert. denied, 552 U.S. 1237 (2008); see, e.g., United States v. Diaz, 922 F.2d 998, 1006 (2d Cir. 1990), cert. denied, 500 U.S. 925 (1991); United States v. Parker, 903 F.2d 91, 102-03 (2d Cir.) ("Parker"), cert. denied, 498 U.S. 872 (1990). In the most common Rule 33(b) situation, in which the new evidence concerns the conduct

of the defendant or the crime with which he is charged, the court is not to grant the new-trial motion unless the evidence would likely result in an acquittal. See, e.g., Persico, 645 F.3d at 109; Owen, 500 F.3d at 87-88; United States v. Diaz, 922 F.2d at 1006; Parker, 903 F.2d at 102-03. Where the newly discovered evidence concerns materially false information provided by a prospective juror in response to clear and unambiguous questions on voir dire, the court should grant the new-trial motion where the juror's false responses "obstructed the voir dire and indicated an impermissible partiality on the juror's part," Colombo, 869 F.2d at 151.

"[W]hen possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's rights to a fair trial." Id. at 152 (internal quotation marks omitted).

> [A] motion for a new trial must be granted if the trial was not fair to the moving party. . . . "One touchstone of a fair trial is an impartial trier of fact--a jury capable and willing to decide the case solely on the evidence before it."

Greer, 285 F.3d at 170 (quoting McDonough, 464 U.S. at 554 (other internal quotation marks omitted)). We noted in Greer that McDonough set out a "two-part test" for whether to grant a motion "for a new trial based on juror nondisclosure or misstatements . . . . First, the party must show that 'a juror failed to answer honestly a material question on voir dire.' [McDonough, 464 U.S. at 556.] Second, the party must show that 'a correct response would have provided a valid basis for a challenge for cause.' Id." Greer, 285 F.3d at 170.

This Court reviews the denial of a Rule 33 motion for a new trial for abuse of discretion. See, e.g., Greer 285 F.3d at 170; Persico, 645 F.3d at 109; Owen, 500 F.3d at 87-88; Mayo, 14 F.3d at 132; Siddiqi, 959 F.2d at 1173; Parker, 903 F.2d at 103. A court abuses its discretion if (1) it takes an erroneous view of the law, (2) its decision rests on a clearly erroneous

finding of fact, or (3) its decision--though not necessarily the product of a legal error or a clearly erroneous factual finding--cannot be located within the range of permissible decisions. See, e.g., Owen, 500 F.3d at 87-88; United States v. Thorn, 446 F.3d 378, 391 (2d Cir. 2006).

### 1. The Right to an Impartial Jury

The right of a defendant in a criminal prosecution to a trial "by an impartial jury" is expressly guaranteed by the Sixth Amendment to the Constitution. U.S. Const. amend VI. "[T]rying an accused before a jury that is actually biased" not only transgresses the express guarantee of the Sixth Amendment but also "violates even the most minimal standards of due process." United States v. Nelson, 277 F.3d 164, 206 (2d Cir.), cert. denied, 537 U.S. 835 (2002); see, e.g., In re Murchison, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process.").

An impartial jury is one in which all of its members, not just most of them, are free of interest and bias. See, e.g., United States v. Martinez-Salazar, 528 U.S. 304, 316 (2000) (an error "in the seating of any juror who should have been dismissed for cause . . . . would require reversal"); Parker v. Gladden, 385 U.S. 363, 366 (1966) (per curiam) (despite state law authorizing conviction by an affirmative vote of 10 jurors, a new trial was required where at least two members of the 12-person jury were exposed to unauthorized communications; "petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors").

The voir dire of prospective jurors, who have been placed under oath, "is an important method of protecting a defendant's right to trial by" jurors who are impartial. Colombo, 869 F.2d at 151. A prospective juror who deliberately lies on voir dire is subject to criminal prosecution for perjury pursuant to, e.g., 18 U.S.C. § 1621 ("perjury" includes willfully making a false statement as

40

to a material matter under oath), to possible criminal contempt pursuant to 18 U.S.C. § 401, and to possible substantial restitution claims by the government under 18 U.S.C. § 3663, cf. United States v. Hand, 863 F.2d 1100, 1101-07 (3d Cir. 1988) (where juror was convicted of contempt for misconduct during trial, which necessitated the vacatur of guilty verdicts, affirming order that juror, inter alia, pay restitution to the government in the amount of $46,850). See generally Colombo, 869 F.2d at 151. Where the juror has lied for the purpose of securing a seat on the jury--a mission apparently "so powerful as to cause the juror to commit a serious crime"--it "reflect[s] an impermissible partiality on the juror's part." Id. Such conduct

> not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court. . . . [C]ertainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's rights to a fair trial.

Id. at 151-52 (footnote omitted) (internal quotation marks omitted). Where the juror has deliberately concealed information, "bias" is to be "presume[d]." Id. at 152; see, e.g., McCoy v. Goldston, 652 F.2d 654, 659 (6th Cir. 1981).

In the present case, the record amply supports the findings of the district court that Conrad repeatedly lied during voir dire, see Part I.A.1. above, and that she did so in order to be chosen as a juror, see Part I.A.3. above. Further, the court found that Conrad was in fact, impliedly, and inferably biased against the defendants, see Part I.C. above, and that if the court had known the truth, it would have dismissed Conrad for cause: "Conrad's misconduct demonstrates that she was incapable of being an impartial juror and this Court would have struck her for cause." Daugerdas, 867 F.Supp.2d at 470.

41

We thus have no difficulty with the ruling of the district court in the present case that the jury empaneled to hear the case against these defendants was not an impartial jury.

## 2. Principles of Waiver

We have considerable difficulty, however, with the district court's denial of Parse's Rule 33 motion for a new trial on the premise that Parse "waived his claim for a new trial based on Conrad's alleged misconduct" because, according to the court, "Parse's attorneys knew--or with a modicum of diligence would have known--that Conrad's voir dire testimony was false and misleading." Daugerdas, 867 F.Supp.2d at 476. Preliminarily, we note that Parse points out that the district court made no finding that he himself had any knowledge whatever about Conrad's misrepresentations in voir dire, and he argues that the district court erred in ruling that his right to trial before an impartial jury was waivable by his attorneys without his personal knowledge or acquiescence (see Parse brief on appeal at 43-46). However, we need not reach this issue here, see generally New York v. Hill, 528 U.S. 110, 114 (2000) ("[f]or certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel"), because we conclude that the district court erred in its principal rulings with regard to Parse's attorneys. We conclude that to the extent the district court found that Parse's attorneys knew Conrad had lied, that finding is not supported by the record; and to the extent that the court ruled that Parse's right was waived because his attorneys failed to exercise due diligence to learn the facts, that ruling was based on an error of law.

"The classic definition of waiver" is the "'intentional relinquishment or abandonment of a known right or privilege.'" Fay v. Noia, 372 U.S. 391, 439 (1963) (quoting Johnson v. Zerbst,

42

304 U.S. 458, 464 (1938) (emphases ours)); see, e.g., United States v. Olano, 507 U.S. 725, 733 (1993).

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case . . . .

Johnson v. Zerbst, 304 U.S. at 464 (emphasis added). A right is not a "known right" unless one not only is aware of the abstract legal principle, but also knows the facts that make that principle applicable to him. See, e.g., Brady v. United States, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." (emphasis added)). Waiver is not to be presumed. Indeed, "[t]here is a presumption against the waiver of constitutional rights . . . ." Brookhart v. Janis, 384 U.S. 1, 4 (1966) (emphasis added); see, e.g., Glasser v. United States, 315 U.S. 60, 70-71 (1942) ("To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights."). The Government bears the burden of proving a defendant's waiver by a preponderance of the evidence. See United States v. Mastrangelo, 693 F.2d 269, 273-74 (2d Cir. 1982).

In Olano, the Supreme Court analyzed the availability of relief to a litigant under Rule 52(b) of the Federal Rules of Criminal Procedure, which provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention," Fed. R. Crim. P. 52(b). The Court made clear that although one may forfeit his right to relief when he fails to object or otherwise bring an error to the court's attention, not every failure to object or to advance a given argument constitutes a waiver:

Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the "intentional relinquishment or abandonment of a known right."

507 U.S. at 733 (quoting Johnson v. Zerbst, 304 U.S. at 464 (emphasis ours)). "Deviation from a legal rule is 'error' unless the rule has been waived." Olano, 507 U.S. at 732-33. If "a particular right is waivable," and if the defendant has "knowingly and voluntarily" made the choice to forgo that right, the fact that he did not have the benefit of that right "is not error." Id. at 733 (internal quotation marks omitted). On the other hand, the Olano Court explained,

> [m]ere forfeiture, as opposed to waiver, does not extinguish an "error" under Rule 52(b). . . . If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b) despite the absence of a timely objection.

507 U.S. at 733-34. A forfeited error may be corrected, at the court's discretion. (See Part II.A.3. below.)

### a. The District Court's Findings of Knowledge

The district court appears to have found that Parse's attorneys had knowledge sufficient to waive Parse's right to an unbiased jury at at least two critical stages: first, prior to the start of the voir dire, and second, prior to the end of trial. The court found that

> prior to the start of voir dire, Parse's attorneys knew that (1) Juror No. 1 lived in Bronxville, was a plaintiff in a pending personal injury lawsuit, and had a father who was an immigration officer; and (2) a woman with the identical name of "Catherine M. Conrad" was a suspended New York attorney with an alcohol dependency.

Daugerdas, 867 F.Supp.2d at 466 (emphases added). If this was intended as a finding that Parse's attorneys had sufficient knowledge that Conrad was the suspended attorney even prior to trial, it has

several flaws.

First, the court's finding that the attorneys "knew" that the Conrad who was Juror No. 1 "lived in Bronxville" is contradicted by the court's own findings that Conrad's statements that she lived there were false. The court found that, in voir dire, "Conrad answered under oath that she . . . lived in Bronxville 'all my life.' (Trial Tr. at 203.) That . . . was a lie." Daugerdas, 867 F.Supp.2d at 452. The court also found that in stating in her jury questionnaire that "her permanent address was in Bronxville, New York," Conrad "lied." Id. at 458. These findings foreclosed a conclusion that Parse's attorneys "knew" that Juror No. 1 lived in Bronxville. One cannot know a non-fact. Given that when Conrad said she "lived in Bronxville" she "lied," the attorneys could not "kn[o]w" she lived there.

Second, the record shows that the jury roll that was provided to the parties prior to voir dire did not contain sufficient detail to permit the attorneys to determine that Juror No. 1 was the suspended New York attorney. Although they might have learned the suspended attorney's street address and telephone number through the New York State Unified Court System's attorney registration website, the jury roll stated only the borough or municipality in which each potential juror lived; the jury roll did not disclose street addresses or telephone numbers. Further, the address shown for the suspended lawyer Catherine M. Conrad on the attorney registration website was in the Bronx, not Bronxville.

Third, as the district court found, the facts that the juror Conrad had a pending lawsuit and that her father was an immigration officer were revealed by Conrad in response to the court's general questions on voir dire. See Daugerdas, 867 F.Supp.2d at 450 (citing voir dire transcript at 105, 85). We have seen no evidence in the record that Parse's attorneys knew those facts "prior to the start of voir dire," Daugerdas, 867 F.Supp.2d at 466.

45

Fourth, although the attorneys had learned prior to voir dire that there was a suspended attorney named Catherine M. Conrad, the answers given in voir dire by the potential juror Conrad under oath were inconsistent with the juror Conrad's having been an attorney or having been suspended. Conrad stated, inter alia, that she did not work outside the home, that she was a stay-at-home wife, and that her highest educational degree was a B.A. And Conrad denied that she had ever been involved in an investigation by state licensing authorities.

The district court, after considering Conrad's misrepresentations as to her residence, her education, her profession, and her suspension, as well as her false negative responses to questions as to whether she or any member of her family had been convicted of a crime, found that

- Conrad engaged in "startling dishonesty," Daugerdas, 867 F.Supp.2d at 458, "serial perjury," id. at 475, and "lied extensively during voir dire and concealed important information about her background," id. at 451; that

- Conrad's "lies [we]re breathtaking," as "[i]n response to direct and unambiguous questions, she intentionally provided numerous false and misleading answers and omitted material information," id. at 468; that

- "[a]fter hearing the questions posed to the first two prospective jurors, she conjured up a personal profile that she thought would be attractive," id. at 456; that

- Conrad's "deliberate lies [were] engineered to create a fictitious, 'marketable' juror," id. at 468; that

- "Conrad did not tell a discrete lie or two"; instead, she "lied about virtually every detail of her life," id. at 473; that

- "Conrad's lies were calculated to prevent the Court and the parties from learning her true identity," id. at 468-69; and that

- "in her drive to get on the jury" Conrad "created a totally fictitious persona," id. at 473.

Given the record and the amply supported findings that Conrad lied comprehensively in voir dire and

"presented herself as an entirely different person," id., any finding that Parse's attorneys knew prior to trial that Juror No. 1 was the same person as the suspended New York attorney is clearly erroneous.

Based on further information that became available to Parse's attorneys subsequently, the district court also found that those attorneys knew Conrad was the suspended lawyer just prior to the jury's commencement of deliberations. That information was (1) that, on the day before deliberations began, Conrad sent a note to the court asking whether the jury would be instructed on theories of respondeat superior and vicarious liability--terms that had not been raised during the trial; and (2) that, as a result of that peculiar inquiry, Parse's attorneys immediately conducted some additional investigation and obtained the Westlaw Report (or "Report") on Catherine M. Conrad the suspended lawyer. Although the Parse attorneys immediately conducted additional investigation into persons named Catherine Conrad, they said they did not think the inquiry by juror Conrad indicated that she was an attorney because the concepts she mentioned were not relevant to criminal law; they thought she might have been exposed to those concepts as a result of the pending personal injury action she had mentioned in voir dire. With respect to the Westlaw Report, however, the court found that the attorneys learned principally (a) that the suspended lawyer Catherine M. Conrad "used a Bronxville address, the same small village given for Juror No. 1 on the jury roll," and (b) "that living in the same household was a Robert J. Conrad," Daugerdas, 867 F.Supp.2d at 466. The court stated that "Trzaskoma had concluded that the Catherine M. Conrad in the Westlaw Report was the same person as Juror No. 1." Id. (emphases added).

We cannot agree that these or other aspects of the Westlaw Report--about the Catherine M. Conrad whom the Report stated it was "99%" sure was an attorney whose license to practice was "SUSPENDED . . . CURRENTLY"--furnished sufficient evidence to carry the government's burden

47

of proving that Parse's attorneys knew that the juror Conrad was that lawyer. Although the Report listed a Bronxville street address for the suspended lawyer (which of course could not be verified by comparison to the jury roll because, as indicated above, the jury roll provided no street addresses), the Report also showed two street addresses for the suspended lawyer in the Bronx and one for her in Brooklyn; the district court itself noted that the Report showed that the suspended lawyer "resided in Bronxville, among other places," Daugerdas, 867 F.Supp.2d at 480 (emphasis added). The listing of four different addresses for the suspended lawyer Catherine M. Conrad--even though one was in Bronxville--did not reveal that the juror Conrad was the suspended lawyer, given that Conrad stated on voir dire that she had "'lived at [her] current address'" in Bronxville "'[her] whole life,'" id. at 450 (quoting voir dire transcript at 203).

Nor did the Westlaw Report state that Robert J. Conrad was the father of Catherine M. Conrad the attorney. Rather, it described "Robert J. Conrad" as "Spouse." And even if that Robert J. Conrad was an immigration judge, the Westlaw Report's indication that he was the husband of the suspended lawyer Catherine M. Conrad would have meant that that Catherine M. Conrad was not Conrad the juror. The husband of Conrad the juror, according to her statements on voir dire, was retired; and he had retired from owning "'bus companies,'" Daugerdas, 867 F.Supp.2d at 450 (quoting voir dire transcript at 203).

In addition, the Westlaw Report said that the head of the household in which Robert J. Conrad and the suspended lawyer Catherine M. Conrad lived was "Ms. Edwina C. Conrad." In voir dire, Conrad was asked with whom she lived. She gave no indication that she lived with her father, or that she lived in a household that included anyone other than her husband.

Finally, in concluding that Parse's attorneys knew based on the Westlaw Report that

48

Conrad and the suspended lawyer Catherine M. Conrad were the same person, the district court also referred to the fact that the Report said that Catherine M. Conrad "participated in a lawsuit involving 'Saranta Foods Ltd., Unity Coffee,'" which was "pending in Bronx Supreme Court." Daugerdas, 867 F.Supp.2d at 480. In voir dire, Conrad had stated that she was the plaintiff in a pending lawsuit in that court. But the Westlaw Report mentioning "Saranta Foods Ltd., Unity Coffee" identified that company as a judgment "Creditor"; and none of the cases listed by the Report identified Catherine M. Conrad as a plaintiff.

In sum, although the court stated that Parse's attorneys' "suspicion that Juror No. 1 was not the person she represented herself to be during voir dire . . . . leavened into tangible evidence that Conrad was a monstrous liar," id. at 484 (emphasis added), that leavening did not occur until Conrad sent her May Letter to the government after the verdicts were returned. It was that postverdict letter that first disclosed the juror Conrad's (claimed) street address (against which one of the addresses in the Westlaw Report could be matched) and her telephone number (against which the telephone number shown for the suspended lawyer Catherine M. Conrad on the New York attorney registration website could be matched). And the monstrosity of her deliberate and purposeful voir dire deceit came to light in her statements to the court in the hearings conducted thereafter. As Conrad had "lied about virtually every detail of her life," id. at 473, almost none of the Westlaw Report information cited by the district court about the suspended lawyer matched the information Conrad had provided under oath during voir dire. The information in that Report did not support a finding that Parse's attorneys knew that Conrad the juror was the same person as Catherine M. Conrad the suspended lawyer.

The district court noted variously that "Trzaskoma believed" Robert J. Conrad "to be

49

Conrad's father, the immigration judge," Daugerdas, 867 F.Supp.2d at 466 (emphasis added), that in the May 12 B&R internal e-mails "Trzaskoma expressed her belief that the suspended attorney Catherine M. Conrad and Juror No. 1 were the same person," id. at 463 (emphasis added), and "that counsel for Parse believed that Juror No. 1 was the suspended New York attorney named Catherine M. Conrad," id. at 480 (emphasis added). But the court ultimately concluded that "Trzaskoma, the Brune & Richard partner who oversaw and coordinated juror research, demonstrated her knowledge" that Conrad was the suspended lawyer "through the simple, declarative language of her e-mail on May 12, 2011: 'Jesus, I do think that it's her,'" id. (emphasis added). Repeating that reaction by Trzaskoma to information in the Westlaw Report, see Daugerdas, 867 F.Supp.2d at 465, 465, 467, 480, 482, 482, 483, the district court concluded that that "vivid declaration that Juror No. 1 was suspended attorney Catherine M. Conrad," id. at 480 (emphasis added), was reliable proof that Parse's attorneys "knew," id., Conrad was the suspended lawyer because it was "tantamount to an excited utterance," id. at 482, which was "a reliable indication of her state of mind," id. We have several difficulties with this reliance on the Trzaskoma excited utterance to show that she "knew" Conrad was the suspended lawyer.

First, it was divorced from its context, quoted in Part I.B. above; "Jesus, I do think that it's her" was immediately followed by a request for further exploration: "Can you please track down that lawsuit?" Daugerdas, 867 F.Supp.2d at 464 (internal quotation marks omitted). Although a request for additional information does not necessarily belie knowledge, the fact that Trzaskoma continued to grapple with the possibility that juror Conrad and attorney Conrad were the same person-- and discussed that possibility in general with her partners before coming to the conclusion that they were not the same person--indicates that Trzaskoma's "I think" utterance exhibited something short

50

of actual knowledge.

Second, and more importantly, Trzaskoma did not say she knew Conrad was the suspended lawyer. The rationale for considering an "excited utterance" to be sufficiently reliable to be admissible in evidence for its truth, id. at 482, does not justify attributing to the utterance a fact that is different from what was uttered. Belief, surmise, and opinion are not the same as knowledge. Neither in context nor on its face did Trzaskoma's "Jesus, I do think that it's her" exclamation (emphasis added) express knowledge.

Third, the court's statement that "Trzaskoma's knowledge of Conrad's identity was far deeper than a mere 'possibility,' as shown by her review of the 2007 and 2010 Suspension Orders and the Westlaw Report," Daugerdas, 867 F.Supp.2d at 482, is not supported by those documents. The suspension orders themselves showed only that the attorney Catherine M. Conrad had been disciplined, not that she was the person described in Juror No. 1's voir dire responses. Further, the Westlaw Report was a document that Trzaskoma testified she had not yet read when she said "I do think that it's her"; she had read only the paralegal's email quoting parts of the report that also suggested differences between the suspended attorney and Juror No. 1. Moreover, even had she read the report itself, its contents could not justify the court's attribution to her of actual knowledge that the suspended attorney Conrad was Juror No. 1. As discussed above, the Westlaw Report was rife with information that was inconsistent with the sworn voir dire statements of Conrad the potential juror, including different number of residences, different places of residence, different members of the household, and a different spouse. The profile of suspended attorney Conrad and the profile of the prospective juror who lied so comprehensively as to, inter alia, residence, level of education, occupation, and criminal or investigatory charges, thereby presenting herself as, in the words of the

51

district court, an "entirely different person," id. at 473, were simply too disparate to support the imputation to Parse's attorneys of knowledge that those were profiles of the same person.

Finally, the court's finding that Trzaskoma's "I do think that it's her" excited utterance meant that Trzaskoma "knew" Conrad was the suspended attorney is also undercut by the court's finding that Trzaskoma "never shared the existence of the Westlaw Report or its contents"--quotes from which had prompted that utterance--"with [her law partners] Brune or Edelstein" in their "Foley Square conversation" that day, Daugerdas, 867 F.Supp.2d at 465. All three partners testified that they had thought it inconceivable that an attorney would so extensively lie during voir dire in order to hide her true identity, and that they thought Conrad's note to the court on the previous day inquiring about a possible instruction on legal principles that were irrelevant to a criminal case indicated that Juror No. 1 was not an attorney. Although the district court stated that the attorneys should have exercised a "modicum of diligence" to pursue the matter, id. at 476, and termed their failure a "tragic misjudgment," id. at 466, the record indicates that Trzaskoma's "I think" utterance did not reflect knowledge.

The district court stated that its conclusion that Parse's attorneys "knew" Conrad was the suspended lawyer Catherine M. Conrad prior to commencement of the jury's deliberations was supported by its view that Parse's attorneys had been "not entirely candid" in their cataloguing of the "facts that purportedly 'came to light'" and gave rise to the new-trial motion. Daugerdas, 867 F.Supp.2d at 480-81. The court emphasized that they learned prior to voir dire that an attorney named Catherine M. Conrad had been suspended in 2010; and although the attorneys maintained that in light of the voir dire they concluded that the suspended attorney and the prospective juror were not the same person, the court found "unpersuasive" the attorneys' contention that "they reasonably relied on

52

Conrad's voir dire answers." Id. at 483. Yet Conrad's answers, "about virtually every detail of her life," id. at 473, were given under oath. As the court noted earlier in its opinion, "[t]he sanctity of an oath is central to the sound administration of justice. An oath impresses on one's conscience the duty to testify truthfully." Id. at 448. And indeed, before the start of voir dire, when defense counsel suggested that the court should inquire further before excusing prospective jurors who claimed that serving on the expected three-month trial would cause them economic hardship, the court said "when somebody declares under penalties of perjury that they rely on commissions for their income, I wouldn't ask another question beyond that." (Voir dire transcript at 5.)

Virtually everything that came to light about Catherine M. Conrad the suspended lawyer was inconsistent with Conrad's voir dire responses given under oath. Although Parse's attorneys of course could have asked the court to pose additional questions to Conrad, we conclude that their failure to do so, or otherwise to pursue additional information sufficient to reveal that Conrad had pervasively lied despite her oath, did not provide an appropriate basis for the court's finding that they did in fact know the truth.

In sum, to the extent that the district court ruled that Parse waived his right to trial before an impartial jury because his attorneys knew that Conrad had lied during voir dire, we conclude that that ruling rested on a clearly erroneous finding of fact.

b.      The District Court's Ruling that Knowledge Was Not Necessary

The district court ruled, alternatively, that Parse waived his right to an impartial jury because his attorneys failed to exercise due diligence to discover that Conrad was the suspended lawyer. It stated that

53

to avoid waiver, Parse's attorneys were required to act with reasonable diligence both after they learned about the 2010 Suspension Order prior to voir dire and after they obtained the Westlaw Report on May 12, 2011--the day jury deliberations started. But they did not. Parse's attorneys were on sufficient notice and they should have raised their concerns with the Court at voir dire and then again at the beginning of jury deliberations. At the very least, they should have taken additional steps to acquire sufficient information to make an informed decision. Their failure to do so constitutes a waiver.

Daugerdas, 867 F.Supp.2d at 483 (emphases added). As discussed above, however, waivers must be knowing, intelligent acts, done with sufficient awareness of the relevant facts. A ruling that a litigant has "waive[d]" a right because he failed "to acquire sufficient information to make an informed decision," id., is based on an erroneous view of the law.

The district court sought to justify its modification of the waiver concept--i.e., expanding it to encompass circumstances where the litigant did not diligently acquire the requisite knowledge--by stating that such an expansion is needed in order for the judicial system to operate properly. It said:

A waiver standard predicated solely on actual knowledge, to a 100% certainty, would result in retrials where defense attorneys had substantial information of juror misconduct that put them on reasonable notice that the Court should be notified and additional inquiry undertaken. Parse's position is inconsistent with the institutional imperative of ensuring that the trial court is given every available opportunity to attempt to salvage the trial by ridding the jury of prejudicial influences.

Daugerdas, 867 F.Supp.2d at 482-83 (internal quotation marks omitted) (emphases added). This explanation reflects a further misapprehension of the law.

The district court's notion that "waiver[s]" must be imputed in order to avoid unnecessary waste of judicial time and resources ignored the related, and less rigid, principles of forfeiture. As the Supreme Court explained in Olano, a litigant who merely fails to make a timely

54

assertion of a right, and does not knowingly and intentionally relinquish that right, forfeits his right to complain of that error; but a forfeiture does not bar the court from exercising discretion to correct the error if it affected the litigant's substantial rights. See 507 U.S. at 733-35. That facet of the forfeiture concept exists because "[a] rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with . . . the rules of fundamental justice." Id. at 732 (internal quotation marks omitted).

Rule 33 gave the district court discretion to grant a new trial in the interest of justice. The court's refusal to exercise that discretion on the ground that Parse had waived his right to complain of juror bias was based on errors of law and erroneous findings of fact.

### 3. Plain-Error Review

Parse and the amicus council of defense lawyers urge us to adopt a general rule that lawyers need not bring concerns about possible juror misconduct--including concerns about possible misstatements made during voir dire--to the attention of the trial court unless counsel actually know that such misconduct has occurred. We doubt that such a sweeping and absolute rule is appropriate; but in any event, we need not attempt to fashion an appropriate general rule in order to resolve the present appeal. Assuming that the district court was correct in its view that Parse's attorneys should have alerted the court to whatever suspicions they had about Conrad prior to the conclusion of the jury's deliberations, we conclude that the improper presence of Conrad on the jury--a forfeited error-- warrants plain-error review and warrants reversal under that standard.

Under Fed. R. Crim. P. 52(b), which provides that "[a] plain error that affects

substantial rights may be considered even though it was not brought to the court's attention,"

> before an appellate court can correct an error not raised at trial, there must be (1) "error," (2) that is "plain," and (3) that "affect[s] substantial rights." . . . . If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings."

Johnson v. United States, 520 U.S. 461, 466-67 (1997) (quoting Olano, 507 U.S. at 732 (other internal quotation marks omitted)). An "error" is an unwaived "[d]eviation from a legal rule." Olano, 507 U.S. at 732-33 (internal quotation marks omitted). An error is "plain" if it is "clear" or "obvious." Id. at 734 (internal quotation marks omitted). And an error affects substantial rights when it is prejudicial--that is, when there is a "reasonable probability" that the error affected the outcome of the proceeding. United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004) (internal quotation marks omitted). The burden of meeting these criteria for plain-error review, and, if they are met, of persuading the court to exercise its discretion to grant relief based on the fourth factor, is on the defendant. See, e.g., Olano, 507 U.S. at 734-35; Dominguez Benitez, 542 U.S. at 82.

We have no difficulty in concluding that Parse meets his burden in the present case. Here the relevant proceeding was jury selection. The Sixth Amendment gave him the right to be tried before an impartial jury. Conrad, who lied extensively during voir dire, precisely in order to gain a place on the jury, was seated on the jury. As discussed in Parts II.A.1. and I.C. above, such false statements indicate an impermissible partiality, and the district court found that Conrad was actually, impliedly, and inferably biased. The court concluded that, had it known of those falsehoods, it would have dismissed Conrad for cause. It is beyond dispute that there was "error" within the meaning of Rule 52(b) and that the error is "plain" within the meaning of Olano and Johnson.

It is also clear on the present record--which includes both the remarkable May Letter

56

that Conrad sent the government after trial and Conrad's statements and hearing testimony thereafter--that the seating of Conrad on the jury affected Parse's substantial rights, as "Conrad was actually biased against Defendants." Daugerdas, 867 F.Supp.2d at 471. In the posttrial investigation, Conrad revealed, inter alia, that she had lied on voir dire believing that the "[d]efendants . . . were 'crooks'." Id. at 456 (quoting Hr'g Tr. 210, 229). And, with respect to Parse in particular, the court found that in Conrad's May Letter, "[h]er bias . . . bled through when she wrote that she 'did fight the good fight' against acquitting Parse on any counts but eventually had to 'throw in the towel.' Her choice of words shows that Conrad saw herself not as a fact-finder, but as a partisan for 'Our Government.'" Id. at 471 (emphases ours).

In these circumstances--in which a juror aligned herself with the government, lied pervasively in voir dire for the purpose of avoiding dismissal for cause, believed prior to the presentation of any evidence that the defendants were "'crooks,'" and expressly mentioned Parse as a target of her efforts to persuade the other jurors to convict--a refusal to order a new trial for Parse would seriously affect the fairness, integrity, and public reputation of judicial proceedings.

We reverse the district court's denial of Parse's motion for a new trial.

B. Parse's Sufficiency Challenges

Parse was found guilty of two offenses: mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and corruptly endeavoring to obstruct the administration of the internal revenue laws, in violation of 26 U.S.C. § 7212(a). He argues that he was entitled to a judgment of acquittal on both counts--obviating any new trial--on the ground that the government failed to prove the knowledge or intent elements of those offenses.

57

The mail fraud section makes it a crime to use the mails in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The "essential elements of a mail fraud charge" are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails to further the scheme." United States v. Vilar, 729 F.3d 62, 91 n.26 (2d Cir. 2013) (internal quotation marks omitted), cert. denied, 134 S. Ct. 2684 (2014). Because mail fraud is a specific intent crime, the government must "prove beyond a reasonable doubt that the defendant was guilty of a conscious knowing intent to defraud," United States v. Regan, 937 F.2d 823, 827 (2d Cir. 1991) (internal quotation marks omitted), cert. denied, 504 U.S. 940 (1992), and "that the defendant contemplated or intended some harm to the property rights of the victim," United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). Federal taxes to which the United States is entitled constitute "property" within the meaning of the mail fraud statute. See, e.g., Fountain v. United States, 357 F.3d 250, 259-60 (2d Cir. 2004), cert. denied, 544 U.S. 1017 (2005).

Section 7212(a) makes it unlawful to "corruptly . . . obstruct[] or impede[], or endeavor[] to obstruct or impede, the due administration of" the Internal Revenue Code. 26 U.S.C. § 7212(a). To act or endeavor "corruptly," within the meaning of this section, means to act or endeavor "with the intent to secure an unlawful advantage or benefit either for one's self or for another." United States v. Kelly, 147 F.3d 172, 177 (2d. Cir. 1998) (internal quotation marks omitted).

Parse contends that the government failed to establish the specific intent element of § 1341, i.e., his intent to defraud the Internal Revenue Service ("IRS") by depriving it of taxes owed, because the government did not show that he had understood the impropriety of claiming tax losses

58

based on the tax shelter transactions in question (see Parse brief on appeal at 74), and similarly that it failed to establish the "'corruptly' element of §7212(a)" because it did not show that he had "acted with the requisite 'consciousness of unlawfulness'" (Parse brief on appeal at 95). Viewing the evidence in the light most favorable to the government, and crediting every inference that could fairly have been drawn in the government's favor, see, e.g., United States v. Vilar, 729 F.3d at 91; United States v. Biaggi, 853 F.2d 89, 99 (2d Cir. 1988), cert. denied, 489 U.S. 1052 (1989), we reject both of Parse's sufficiency challenges.

"Since Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), it has been settled law that for transactions to be recognized for tax purposes they must have economic substance." Gardner v. Commissioner, 954 F.2d 836, 838 (2d Cir.) (internal quotation marks omitted), cert. denied, 504 U.S. 910 (1992). A transaction lacks economic substance if there was "no reasonable possibility that the transaction would result in a profit," United States v. Coplan, 703 F.3d 46, 92 (2d Cir. 2012) (internal quotation marks omitted), cert. denied, 134 S. Ct. 71 (2013), or if it "can not [sic] with reason be said to have purpose, substance, or utility apart from [its] anticipated tax consequences," Lee v. Commissioner, 155 F.3d 584, 586 (2d Cir. 1998) (internal quotation marks omitted).

The trial record here included evidence that Parse was familiar with the economic-substance requirement. He was a certified public accountant, with a master's degree in business administration and years of experience working in financial institutions. He himself used a tax shelter of the type at issue here and received an opinion letter for his personal use, from the law firm that marketed the shelters and employed some of his codefendants. The opinion letter to Parse described the economic substance doctrine in detail; it noted, inter alia, that "a transaction must have economic

59

substance to be respected for federal tax purposes" and that "a transaction which lacks economic substance beyond the creation of tax benefits and which is not imbued with tax-independent considerations is an economic sham without effect for federal income tax purposes." (Government Exhibit 54-1, at M-1 (emphasis added)).

The evidence from which a rational juror could infer that Parse knew that transactions he helped to execute for the tax shelters at issue lacked any profit motive included testimony from several witness. One client testified that he attended a tax shelter meeting in which Daugerdas described investments designed to avoid the client's having to pay taxes on his gains on the sale of certain stock. In that meeting, attended by Parse (see Tr. 6242), Daugerdas stated that

> the profit potential was very low and that going forward, should we choose to
> go forward, if we were questioned about the matter, that our intent was in fact
> to make a profit, but in order for this tax shelter to work, there had to be, in
> effect, a loss to balance off the gains from the stock sale.

(Tr. 6244 (emphasis added)). Another client testified that, with respect to a tax shelter transaction involving foreign currency options, Parse "gave me I think a couple" of foreign currencies "to pick from. And it's whether--I mean, it was like, pick either one, it's not going to matter." (Tr. 3850.) Parse told him there was "a very extreme chance" that the investment could make money, "but generally speaking, it's going to amount to a big loss." (Id.) Another witness described conversations with Parse that he had as a partner in the accounting firm that marketed the tax shelters at issue. Parse explained various aspects of the use of short options transactions, and, as to the potential monetary outcomes, said there was a very minute possibility that a client could "hit a lotto," i.e., make a huge profit on his investment. When the witness had asked whether any client had ever "hit[] the lotto," Parse responded, in substance, "no, they watch these things pretty closely, and if anybody ever came

close, they would move the market." (Tr. 6939-41 (emphasis added).)

We conclude that the record was sufficient to permit a rational juror to find that Parse knew that economic substance was essential to the IRS's acceptance of the tax shelter transactions as legitimate, and that he had the specific intent to participate in transactions that had no genuine objective other than depriving the government of taxes.

## C. Other Contentions

Parse also contends that the district court's instructions to the jury with respect to his statute-of-limitations defense to the § 7212(a) obstruction charge were erroneous, and that with respect to both that charge and the mail fraud charge, the instructions were incomplete and deprived him of his defense that he implemented the tax-shelter-related transactions in good faith. We largely disagree.

As to the statute-of-limitations defense, the court instructed the jury that "'[i]n order for you to find any defendant guilty [of obstruction], the government must prove that the defendant you are considering or someone involved in the offense committed or caused to be committed an act of obstruction related to the obstruction count on or after' February 3, 2003" (Parse brief on appeal at 101 (quoting Tr. 8907) (emphases in brief)). Parse argues that this was erroneous in part because it allowed the jury to find the prosecution timely as to him on the basis of an act caused or committed by someone else "no matter how remote from the defendant." (Parse brief on appeal at 101.) However, the language on which Parse focuses was prefaced by the instruction that "[i]f you find that the government has proven all of the elements of the charge of a count beyond a reasonable doubt with respect to a defendant, you must also then consider for certain counts whether the statute of limitations

61

for that count has been satisfied with respect to that defendant" (Tr. 8906 (emphasis added)). Thus, the jury was instructed that it could find the statute of limitations satisfied by an act caused by someone who was "involved in" (Tr. 8907) the offense that the jury, by hypothesis, had already found Parse committed. The government argues that as a whole, the court's instructions told the jury to find the crime was within the limitations period if an act was committed within that period "whether the act was committed by the defendant or someone acting together with the defendant" (government brief on appeal at 61 (emphasis added)), i.e., that that someone "must have been a co-schemer together with the charged defendant being considered" (id.). No doubt the court's instruction would have been clearer had these characterizations been added. We assume that the government, having urged that interpretation upon this Court, should have no objection if such a clarification is requested by Parse and included in the instructions at Parse's retrial.

To the extent that Parse also argues that, as a matter of law, the conduct of other persons--such as coconspirators or taxpayers filing returns that calculated their taxes based on losses generated by illegitimate tax shelters--cannot be considered in determining whether the statute of limitations has run on a charge of corruptly obstructing the administration of the tax laws, we leave that question for resolution, if necessary, on the basis of the evidence presented, arguments made, and instructions given at Parse's new trial.

As to Parse's other complaints, we conclude that the instructions, read as a whole, see, e.g., Cupp v. Naughten, 414 U.S. 141, 146-47 (1973), were not erroneous. They dealt painstakingly with each element of each category of the offenses charged; the court instructed, inter alia, that "[g]ood faith is a complete defense to each of the charges in the indictment" (Tr. 8905); and the court instructed that, as to each defendant, the government had the burden of proving that he or she willfully

62

committed the crimes charged and did not act in good faith (see Tr. 8897-98, 8905). The trial that was conducted was complex, see, e.g., Daugerdas, 867 F.Supp.2d at 467 ("the largest tax fraud prosecution in U.S. history"); 25 counts against one or more of five defendants were submitted to the jury (requiring the return of 58 verdicts), and the instructions were correspondingly complicated. The court was not required to introduce further intricacies by discussing scenarios for which there was no evidence in the record. The charges against Parse's codefendants have since been resolved; any potential confusion engendered by instructions catering to the complexity of the first trial is unlikely to recur with respect to the two counts at issue in the retrial of Parse alone.

                                    CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal, and, except as indicated above, have found them to be either moot or without merit. The judgment of conviction against Parse is vacated, and the matter is remanded for a new trial in accordance with the foregoing.

STRAUB, *Circuit Judge*, concurring:

David Parse is entitled to a new trial. I write separately because I believe he is entitled to a new trial whether or not his attorneys knew of the juror misconduct in this case.

The circumstances presented by this appeal are extraordinary. As the majority put it, this is a case in which one of the empaneled jurors, Catherine Conrad,

> aligned herself with the government, lied pervasively in voir dire for the purpose of avoiding dismissal for cause, believed prior to the presentation of any evidence that the defendants were "'crooks,'" and expressly mentioned Parse as a target of her efforts to persuade the other jurors to convict.

Maj. Op. at 56. Where, as here, there is an uncontroverted finding by the District Court that a juror who rendered verdict was actually biased and, indeed, perjured herself in order to ensure that she was seated on the jury, a defendant cannot waive his right to a new trial. Therefore, I join in all

but Part II.A of the majority's opinion. As to that section, I concur only in the result.[1]

The right to a jury trial has been recognized by our courts as our "most priceless." *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). That right "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," since "only the jury can strip a man of his liberty or his life." *Id.* The seating of a biased juror who should have been dismissed for cause requires reversal. *See United States v. Martinez-Salazar*, 528 U.S. 304, 316-17 (2000).

To be sure, a criminal defendant who fails to make a timely objection to a juror may waive his right to later challenge that juror's impartiality. *See United States v. Nelson*, 277 F.3d 164, 219 (2d Cir. 2002) (Straub, *J.*,

---

[1] I am not persuaded by the majority's conclusion that the District Court clearly erred in finding that Parse's attorneys knew that Conrad had lied during voir dire. *See* Maj. Op. at 43-54. The District Court was in the best position to assess Trzaskoma's credibility, and the record does not demonstrate that the District Court's factual determinations were clearly erroneous. *See United States v. McLean*, 287 F.3d 127, 133 (2d Cir. 2002) ("We give a district court's findings as to the credibility of witnesses 'strong deference.'"). Nevertheless, because I believe Parse could not have waived his right to an impartial jury even if his attorneys knew of the juror's misconduct, I find it unnecessary to address the issue.

dissenting); *United States v. Ragland*, 375 F.2d 471, 475 (2d Cir. 1967); *see, e.g., United States v. Brazelton*, 557 F.3d 750, 752-55 (7th Cir. 2009) (finding defendant waived objection to biased juror when he expressly declined court's invitation to challenge the juror for cause).

But waiver is not without its limits. Some rights are "so fundamental to the reliability of the factfinding process that they may never be waived without irreparably discrediting the federal courts." *United States v. Mezzanatto*, 513 U.S. 196, 204 (1995) (internal quotation marks and brackets omitted). Courts have an independent interest in ensuring the fairness and integrity of the criminal process, both with respect to each individual defendant but also so that "legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988) (holding that, for this reason, courts may refuse to accept defendant's waiver of attorney's conflict of interest).

In holding that Parse waived his right to an impartial jury, the District Court relied on applications of the waiver doctrine in *McDonough*

*Power Equip., Inc. v. Greenwood,* 464 U.S. 548 (1984) and *Stern v. Marshall,* 131 S. Ct. 2594 (2011). *McDonough* involved a juror's "mistaken, though honest" response to a voir dire question in a civil product liability action. In a footnote, the Court remarked that if the information about the juror had been known to defendants or their counsel during voir dire, they "would be barred from later challenging the composition of the jury when they had chosen not to interrogate [the] juror." 464 U.S. at 550 n.2. In *Stern*, the Court held that a litigant who repeatedly assured the bankruptcy court that "he was happy to litigate there" waived his right to challenge the bankruptcy court's authority to decide his claim for defamation. 131 S. Ct. at 2608. These cases are readily distinguishable because they do not concern a criminal defendant's Sixth Amendment right to trial by an impartial jury, nor was there a finding of actual juror bias.

However, the District Court rightly pointed out that the cases reflect the "disfavor of litigants who fail to act on information in their possession only to claim later that such information resulted in a violation of their

-4-

rights." *United States v. Daugerdas*, 867 F. Supp. 2d 445, 477 (S.D.N.Y. 2012). The courts that have held that a criminal defendant's right to an impartial jury is subject to waiver has so concluded on the grounds that a contrary rule would permit a defendant to "gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." *United States v. Bolinger*, 837 F.2d 436, 439 (11th Cir. 1988) (finding waiver without reaching merits of juror bias claim); *see United States v. Dean*, 647 F.2d 779, 782 (8th Cir. 1981), *on reh'g*, 667 F.2d 729, 734 (1982) (en banc) ("[A]ppellant, by not bringing the question of juror misconduct to the attention of the trial court before the verdict was returned, thereby waived his right to a new trial."). The Sixth Circuit, on the other hand, has taken the view that a criminal defendant's right to trial by an impartial jury cannot be waived, explaining that the "presence of a biased juror, like the presence of a biased judge, is a structural defect in the constitution of the

trial mechanism." *Hughes v. United States*, 258 F.3d 453, 463 (6th Cir. 2001) (internal quotation marks omitted).

We have not yet defined the precise limits on a defendant's ability to waive an impartial jury, but that such a limit exists is beyond dispute. *See United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985) ("[I]f the parties stipulated to trial by 12 orangutans the defendant's conviction would be invalid notwithstanding his consent, because some minimum of civilized procedure is required by community feeling regardless of what the defendant wants or is willing to accept."). In *United States v. Nelson*, we found that the defendants did not validly waive their right to an impartial jury when they agreed to the empaneling of a juror in order to accede to the district court's improper scheme to achieve a racially mixed jury. *Nelson*, 277 F.3d at 205-07 (noting "continued allegiance" to "powerful dicta that the right to an impartial fact finder might be inherently unwaivable"). I dissented in *Nelson* because the record in that case indicated that the juror demonstrated only potential bias during voir dire

and the defendants expressly consented to the juror's seating. I explained that the presence of the juror on the jury, however improper, was not unwaivable error because it did not "fundamentally undermine[] the validity and fairness of the defendants' trial." *Id.* at 220 (Straub, *J.*, dissenting).

But this is not a case involving potential bias, or in which a juror answered a voir dire question dishonestly out of embarrassment or shame, or merely expressed doubts about his or her ability to serve impartially. Conrad was actually biased against the defendant. As the District Court found, Conrad saw herself "not as a fact-finder, but as a partisan" for the prosecution who characterized her efforts to persuade other jurors against acquitting Parse as "'fight[ing] the good fight.'" *Daugerdas*, 867 F. Supp. 2d at 470-71. Although Conrad denied that she was biased, the District Court found she was a "pathological liar and utterly untrustworthy" and that her statements "reflected a pre-existing bias" against the defendants. *Id.* I am not aware of a case involving more egregious juror misconduct than that

found here, a finding which is undisputed on appeal.  We have never upheld a verdict rendered under these circumstances, and to do so would be to make a farce of our system of justice.

I am sensitive to concerns about the risk of "sandbagging" on the part of defense counsel, as articulated by the District Court, *see Daugerdas*, 867 F. Supp. 2d at 476-85, and in our prior cases, *see Nelson*, 277 F.3d at 220 (Straub, *J.*, dissenting).  But where there has been a finding of actual juror bias, such concerns, however legitimate, must yield to the preservation of the right which is at the very foundation of our constitutional dedication to a fair criminal trial.